## No. 12073

### YOUNGBLOOD v. SOUTHERN RY. CO. *ET AL*

#### (134 S. E., 660)

1. MASTER AND SERVANT.—Where employee's injuries are caused wholly or in part by negligent acts of employer, recovery can be had under Federal Employers' Liability Act, unless defeated by affirmative defense pleaded and proved (U. S. Comp. St. §§ 8657-8665).

2. MASTER AND SERVANT.—Evidence of railroad's negligence in signaling and directing movements of trains *held* sufficient to go to jury under Federal Employers' Liability Act, notwithstanding contributory negligence of conductor (U. S. Comp. St. §§ 8657-8665).

---

NOTE.—Negligence of employer as basis of liability under Federal Employers Liability Act, see notes in 47 L. R. A. (N. S.), 48; L. R. A. 1915-C, 47; 12 A. L. R., 699; 18 R. C. L., 826; 3 R. C. L., Supp., 855; 4 R. C. L., Supp., 1211; 5 R. C. L., Supp., 1004.

Before TOWNSEND, J., Barnwell, Spring Term, 1925. Reversed, and remanded for new trial.

Action by Mary O. Youngblood as administratrix of the estate of Cleveland J. Youngblood, deceased, against the Southern Railway Company and the Southern Railway— Carolina Division. Judgment on directed verdict for defendants, and plaintiff appeals.

*Messrs. Wolfe & Berry, W. C. Martin, W. M. Warren, R. C. Holman* and *Brown & Bush* for appellant, cite: *Servant only assumes risk of dangers he knows:* 121 S. E., 596; 107 S. C., 99; 91 S. E., 978; 233 U. S., 504; 34 Sup. Ct., 635; 58 L. Ed., 1062. *Negligence provable by circumstantial evidence:* 104 S. C., 175. *Contributory negligence no bar to recovery under Federal Employers' Liability Act:* 121 S. C., 55; 131 C. C. A., 248; 214 F., 952; 131 C. C. A., 244; 214 F., 948. *Cases distinguished:* 120 S. E., 56; 106 S. E., 565; 266 U. S., 157, 45 Sup. Ct., 33; 69 L. Ed., 212; 263 U. S., 1; 44 Sup. Ct., 1; 68 L. Ed., 131; 240 U. S., 444; 36 Sup. Ct., 406; 60 L. Ed., 732; 242 U. S., 630; 37 Sup. Ct., 15, 61 L. Ed., 537; 235 F., 49; 230 F., 88; 108 Ore., 72; 216 P., 195.

*Messrs. Harley & Blatt,* for respondents, cite: *"Proximate cause":* 122 S. C., 17; 115 S. C., 177; 22 R. C. L., 110-113. *Where negligence of injured employee is proximate cause employer not liable, though employer might have prevented accident:* 120 S. E., 56; 266 U. S., 157; 69 L. Ed., 212; 263 U. S., 1; 68 L. Ed., 131; 240 U. S., 444; 60 L. Ed., 732; 242 U. S., 630; 61 L. Ed., 537; 235 F., 49; 230 F., 88; 108 Ore., 72; 216 P., 195.

September 22, 1926.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

An action for damages brought against the defendants by the plaintiff, Mary O. Youngblood, as administratrix of the estate of Cleveland J. Youngblood, deceased, for the

death of her intestate due to alleged acts of negligence on the part of the defendants.

The record, in brief, shows that in the early morning of January 3, 1924, two trains, moving on the Southern Railroad between the town of Branchville and city of Columbia, one going in an easterly, and the other in a westerly, direction, about three miles west of the City of Orangeburg, met in a head-on collision, resulting in the death of a number of persons, one of whom was Youngblood, operating as conductor train No. 483 going west. This suit is the outgrowth of that fearful wreck.

The plaintiff alleged in her complaint, among other things, that the injuries received by Youngblood, and his death, which resulted from said injuries, were due to the negligent acts of the defendants, in that they had incompetent officers and agents to signal and direct the movements of the train which Youngblood was operating as conductor, and in that these officers and agents of the defendants did negligently signal and direct the movements of the said train, bringing about the collision and resulting in the injury and death of Youngblood. The answer of the defendants interposed a general denial, and set up the affirmative defenses of contributory negligence and assumption of risk.

The case came on for trial in the Court of Common Pleas at Barnwell, March, 1925. At the conclusion of the testimony offered, which was voluminous, on motion of counsel a verdict was directed for the defendants by his Honor, Judge Townsend, for the reasons stated by him, that he did not think the evidence tended to show negligence on the part of the defendants in the operation of the trains; that "the letting down of the semaphore board by the agent at Orangeburg merely brought about a condition under which the collision occurred"; and that "the collision was due entirely to the fault of Conductor Youngblood in failing to carry out the orders given him at Branchville."

This appeal is taken by the plaintiff, imputing error to the Circuit Judge in directing a verdict for the defendants.

It was agreed by all parties that this action was tried under the Federal Employers' Liability Act of Congress (U. S. Comp. St. §§ 8657-8665), and that, at the time Cleveland J. Youngblood received the injuries from which he died, he and the defendants were both engaged in an act of interstate commerce.

1, 2      There is no dispute as to the law. If the injuries and resultant death of Youngblood, an employee of the defendants at that time, were caused, wholly or in part, by the negligent acts of the defendants, the plaintiff would be entitled to recover, unless defeated by some affirmative defense, duly pleaded and proved. If, however, the injuries received by him resulting in death were due solely to his own acts, no right of action would lie against the defendants, and a directed verdict would be proper.

The testimony shows that on the morning of the day of the collision the engine of a freight train going toward Columbia was disabled at Ft. Motte, a point about 25 miles west of Orangeburg. The company kept a switching crew at Branchville about 18 miles east of Orangeburg, which crew consisted of Youngblood, the conductor, and an engineer and a fireman, and was a night crew. The defendants, through their dispatcher at Charleston, ordered the switching crew to proceed in a westerly direction from Branchville with an engine and tender to carry to Andrews, the company's yards at Columbia, the freight train at Ft. Motte. The train set out from Branchville and operated by Youngblood as conductor was designated as extra 483. At the same time a freight train designated as extra 723 was moving over the same line of road in an easterly direction from Columbia toward Charleston. In view of the necessity that these two trains should meet and pass each other at some point on the road, the dispatcher at Charleston sent the following order, known in railroad circles as a 31 order, to Branchville and Orangeburg: "Extra 723, east, gets this order and meets extra 483, west, at Orangeburg,

engine 483 run extra from Branchville to Andrews." This order was delivered to Youngblood before he left Branchville.

Rule 208 of the defendants' rule book is as follows:

"A train order to be sent to two or more offices must be transmitted simultaneously to as many of them as practicable. When not sent simultaneously to all, the order must be sent first to the superior train.

"The several addresses must be in the order of superiority of trains, each office taking its proper address, and, when practicable, must include the operator at the meeting or waiting point.

"Copies of the order addressed to the operator at the meeting or waiting point must be delivered to the train affected until all have arrived from one direction.

"A train order must not be sent to a superior train at the meeting point if it can be avoided. When an order is so sent, the fact will be stated in the order, and special precautions must be taken to insure safety."

The words "and operator" in an address in a 31 order mean that the operator is to make five copies of the message, one to be kept by him and two to be delivered to the crew of each train. In case the words "and operator" are omitted, the operator makes but three copies, one copy to be retained by himself and two to go to the crew of the superior train. There is conflict in the testimony as to the use of the words "and operator" in the address of the above order, the dispatcher at Charleston asserting that he used them in sending the order, and the copy of the order in his records containing them, while the copy of the order in the records of the operator at Orangeburg does not contain them. It appears that the operator at Orangeburg made only three copies of the order, one for himself and two for the crew of extra 723, which two, however, were never delivered to extra 723 because the collision occurred several miles west of Orangeburg, and before extra 723 reached that city.

Leaving Branchville, extra 483 proceeded in the direction of Orangeburg; and on approaching the station at Orangeburg, within 100 yards of same, the semaphore being held on him, the engineer blew four blasts of the whistle as a signal for directions for the movement of his train. In the meantime, Tyson, operator at Orangeburg, according to his testimony, advised the chief dispatcher at Charleston as to the status of extra 483, and was told by him to clear him (Youngblood), and let him go to the west end of side track or yard at Orangeburg. Rogers, the dispatcher, testified that he told Tyson to clear him (Youngblood), and to tell him to go to the west end pass track and wait on extra 723. For some reason, however, Tyson did nothing except to drop the semaphore. Youngblood then continued with his train in a westerly direction, and soon afterward the wreck occurred.

There is conflict in the testimony as to whether the dropping of the semaphore, the indication of which, according to the defendants' rule book, is "proceed," indicated to Youngblood that his previous orders had been fulfilled, and that he might proceed to his destination, or merely that the Orangeburg operator had no further orders for him, and that he should carry out the order he already held by meeting extra 723 at Orangeburg.

The movement of the trains was entirely in the hands of the dispatcher and the operator, who were responsible for the proper movement and signaling thereof. Over these agents of the defendants the conductor had no control, but in fact received his orders from them.

As this case must be sent back for a new trial, we shall not comment at length or in detail on the testimony. There was testimony tending to show negligence on the part of the defendants in the matter of signaling and directing the movement of the trains in question. The meet order being sent to the superior train at the meeting point, a situation arose, which under the defendants' rule, required special

precautions to insure safety. A question of negligence on the part of the defendants arises in connection with the sending of the meet order by the dispatcher at Charleston or its disregard by the operator at Orangeburg. The operator at Orangeburg also failed to stop the train and give the crew the verbal instructions which the dispatcher at Charleston testified that he had directed him to give. Hence we are of the opinion that, in spite of any contributory negligence on the part of the deceased, Youngblood, the whole matter should have been submitted to the jury for their determination.

The respondents cite a number of cases in support of their contention that no error was committed by the circuit judge in directing a verdict, and urge with great force that these cases are conclusive of the present case. We shall not enter into a review of the cases cited further than to say that examination of them shows that the case at bar differs from each of them, as to facts, in several essential particulars.

The judgment of this Court is that the judgment of the Circuit Court be reversed, and the case remanded to that Court for a new trial.

Messrs. Justices Watts and Blease concur.

Mr. Justice Cothran and Mr. Acting Associate Justice Purdy dissent.

Mr. Chief Justice Gary did not participate.

Mr. Justice Cothran: I regret that I am unable to concur in the opinion of Mr. Justice Stabler, but such is the fact, and I propose to submit, respectfully, the grounds of my dissent.

This is a case invoving a construction of the Federal Employers' Liability Act, and, of course, the decision of this Court must be in harmony with the decisions of the Federal Courts, particularly the Supreme Court of the United States, upon the statute; in fact, this Court is compelled to follow those decisions.

This action was brought for damages on account of the alleged wrongful death of the plaintiff's intestate, Cleveland J. Youngblood, who was killed in a head-on collision between a freight train and the engine (running light) upon which he, as conductor, the engineer, and fireman were riding.

The case was tried before his Honor Judge Townsend and a jury at Barnwell, spring term 1925, and at the conclusion of all of the evidence, upon motion of counsel for the defendants, the presiding judge directed a verdict in their favor upon the following grounds as stated by him:

"The Court: I don't think the evidence distinguishes the case in any material way from the *Davis v. Kennedy Case.* I think that the evidence does not tend to show negligence in directing the operation of the trains, and that the letting down of the semaphore board by the agent at Orangeburg merely brought about a condition under which the collision occurred; but the collision never would have occurred had not the plaintiff violated orders which had been given him at Branchville, and which had not at any time been superseded, directing him to wait at Orangeburg for 723. The collision was due entirely to the fault of the Conductor Youngblood in failing to carry out the orders that were given him at Branchville, and therefore, under the authority of the *Davis v. Kennedy case* [266 U. S., 147; 45 S. Ct., 33; 69 L. Ed., 212], I have to direct a verdict for the defendant."

Counsel for the plaintiff appellant state in their printed argument:

"The appeal brings but one question before the Court, namely: Was there error in directing a verdict for the defendants?"

The facts were these:

Not at all in line with the compass directions, in railroad terminology, Charleston is supposed to be east of Columbia; trains on the Southern Railway, running from Columbia to

Charleston, are considered east-bound trains, and from Charleston to Columbia west-bound. I state this at the outset, for, if it is not borne in mind, confusion is apt to ensue.

On January 3, 1924, a west-bound freight train became delayed at Ft. Motte, a station on the Southern Railway about 22 miles west (considered as above explained) of Orangeburg on account of the breakdown of its engine. It became necessary to send an engine from Branchville, about 18 miles east of Orangeburg, and 40 miles east of Ft. Motte (Orangeburg being practically midway between Branchville and Ft. Motte) to take the place of the disabled engine at Ft. Motte. This occurred about 7 o'clock a. m.

The railway company had a switching or yard engine at Branchville, and decided to send that engine west to relieve the disabled engine, and to carry the freight train which it was pushing to Andrews, the freight yard near Columbia. The crew selected for this relief engine was composed of the intestate Youngblood as conductor, L. K. Dantzler as engineer, and J. B. Witherspoon as fireman. The movements of this engine were regulated by the train dispatcher in Charleston.

At the same time there was a freight train moving on the main line from Columbia to Charleston, known as extra No. 723. The track is a single track and it was necessary to issue a "meet and pass" order for the two trains, extra 723 and the engine designated extra 483. The train dispatcher accordingly wrote out and wired the following telegraphic order: "Extra 723 east gets this order and meets extra 483 at Orangeburg. Engine 483 run extra from Branchville to Andrews." The order was transmitted by wire to the operator at Branchville, who made three copies of it. Two of them were delivered at Branchville to Youngblood, who signed for them at 8:32 a. m. The order was read over by him, and one copy delivered to Dantzler, the engineer, in the presence of the fireman, at Branchville,

5—S. C. 187

before they pulled out. It was also transmitted by wire to the operator at Orangeburg, who made three copies of it; one to be delivered to the conductor of extra 723 when it reached Orangeburg; one to the engineer of that train; and one for his files.

The train order might have been sent in either of two ways: as a 31—3 copy order or as a 31—5 copy order. The difference between the two forms is thus explained: A 31—5 copy order is addressed to the train at a certain station and to the operator; a 31—3 copy order is addressed to the train alone; the words "and operator" are omitted. When the operator receives a 31—5 copy order, he is required to make five copies of it. Two are to be delivered to the conductor of each train ordered to meet at that station, and one retained for his files. When the operator receives a 31—3 copy order, he is required to make only three copies. Two are to be delivered to the conductor of the train addressed, and one retained for his files.

It appears that the order was transmitted and received at Branchville as a 31—3 copy order, and two copies of it were delivered to the conductor of 483 at Branchville; that it was transmitted to Orangeburg as a 31—5 copy order, but was received by the operator there as a 31-3 copy order. The operator at Orangeburg, as stated, made three copies of it; two to be delivered to the conductor of 723 (one of which was to be delivered to the engineer), and one retained for his files. Under this arrangement the operator had no copies to be delivered to the conductor of 483, as he would have had if the order had been received by him as a 31—5 copy order.

Engine 483, then operated as a train, "extra 483 west," left Branchville at 8 a. m. with the three men on it, Youngblood, Dantzler, and Witherspoon—conductor, engineer, and fireman. At Rowesville, 6 miles east of Orangeburg, the conductor received an order to take a spur track at Orangeburg, just east of the station, to allow a passenger

train east-bound to pass, which he did. He then backed out of the spur track, on to the main line, and proceeded towards the station at Orangeburg. When the engine (483) reached a point about 100 yards from the station, it was discovered that the operator had the red board upon that train. The engineer blew for orders, and the operator dropped the board upon him, signifying that he had no orders for 483, which was true as a matter of fact; the order having been received as a 31 order.

The train dispatcher in Charleston testified that he called the operator at Orangeburg, and inquired about 483, and was told that 483 was in the yard; that "I told him to clear him; to tell him to go to the west end pass track and wait on extra 723." The operator admits the conversation, but understood the directions to be "clear him and let him go to the west end of the pass track, etc." The operator did not stop 483, and did not deliver any message to the conductor, under the impression that 483 was going to take the pass track, which was beyond the station about 75 feet. The pass track was about three-fourths of a mile long. The east switch of it was within 75 feet of the station. To enter the pass track at the east switch would require backing out after the train to be met had passed; to enter the pass track at the west switch, nearly a mile away, would require a backing movement going in, and a more expeditious forward movement going out, after 723 had passed.

The fireman testified that 483 passed the station, passed the east switch of the pass track, and stopped at the west switch; that the conductor got down off of the engine and examined the switch; that he thought the conductor was going to back in on the pass track; but that he got back on the engine; that he, the fireman then exclaimed: "Jesus Christ, Blood (Youngblood), you are not going to back in here?" that Youngblood replied, "No, we have time to go to Stilton" (about 2 miles forth to the west).

About half a mile west of Stilton, 483 collided head-on

with extra freight 723. The conductor, engineer, and fire-
man on 723 were instantly killed. The engineer, Dantzler,
on 483 was also instantly killed. The conductor, Young-
blood, was fatally injured, and died soon thereafter.
Witherspoon, the fireman, was seriously hurt. The copies
of the order delivered to Youngblood and Dantzler at
Branchville were found upon their persons when they were
extricated from the wreck.

There is no escape from the conclusion that the conductor,
Youngblood, was guilty of negligence in the handling of
his train. He received the meet order at Branchville. He
read it to the engineer. He stated to another witness the
substance of the order that he was to meet the freight train
at Orangeburg. He had the order in his pocket at the time
of the collision, and knew that it had not been superseded,
annulled, or fulfilled. He passed through the station yard
at Orangeburg, passed the east switch of the pass track,
stopped at the west switch, and declined the suggestion of
the fireman to back into that track, upon the ground that he
had time to reach Stilton, 2 miles further west.

As is said in *Great Northern R. Co. v. Wiles,* 240 U. S.,
444; 36 S. Ct., 406; 60 L. Ed., 732:

"His fate gives pause to blame, but we cannot help point-
ing out that the tragedy of the collision might have been
appalling. [It was distressingly so in the present instance.]
He brought death to himself and to the conductor of his
train. His neglect might have extended the catastrophe to
the destruction of passengers in the colliding train. [It
did, to the unoffending members of the opposing train, con-
ductor, engineer, and fireman.] How imperative his duty
was is manifest. To excuse its neglect in any way would
cast immeasurable liability upon the railroads, and, what is
of greater concern, remove security from the lives of those
who travel upon them; and therefore all who are concerned
with their operation, however high or low in function, should
have a full and an anxious sense of responsibility."

Counsel for the plaintiff practically concede so much, but insist that at most the negligence of Youngblood can only be considered contributory negligence, in view of the negligence of the railway company, and that, under the Federal Employers' Liability Act, a recovery cannot be entirely defeated on that account. The correctness of this contention is conceded, provided the hypothesis that the railway company is shown to have been guilty of an act of negligence which concurred as a proximate cause with the negligence of the conductor to produce the terrible disaster has been established.

Section 2 and 3 of the Federal Employers' Liability Act (U S. Comp. St. §§ 8658, 8659), must be construed together. Section 2 provides:

"Every common carrier * * * shall be liable in damages [to an employee] * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. * * *"

Section 3 establishes the doctrine of comparative negligence, and eliminates the common-law defense of contributory negligence except to the extent of reducing the recovery. Clearly the negligence of the carrier, whether in whole or in part, which fixes liability upon the carrier, must be the, or a proximate cause of the injury. If the injury be shown to have been the result wholly of the carrier's negligence, there is of course no room for any negligence on the part of the injured employee, and liability attaches to the carrier. If the injury be shown to have been the result in part of the carrier's negligence, there is, of course, an assumption that the negligence of the employee has contributed enough to make up the whole, and liability attaches to the carrier, under the comparative negligence rule. If the injury be shown to have been the result wholly of the employee's negligence, there is, of course, no room for any negligence on the part of the carrier which must be freed from liability.

In order to get the benefit of the Federal Employers' Liability Act, therefore, where the injury is shown not to have resulted wholly from the negligence of the carrier, the burden is upon the employee, or his representative, to show that the act of the carrier's agent was not only an act of negligence, but that it contributed as a proximate cause to the injury.

In *Grand Trunk Western R. Co. v. Lindsay,* 201 F., 836; 120 C. C. A., 166, it is tersely expressed:

"It is only when plaintiff's act is the sole cause—where defendant's act is no part of the causation—that defendant is free from liability under the act."

The plaintiff relies, first, upon the negligence of the train dispatcher in Charleston. He was presented as a witness for the plaintiff, and completely exonerated himself from any negligence as to the transmitting a 19 order to the operator at Orangeburg. Counsel say in their printed argument: "Frankly, the facts are that Train Dispatcher Rogers probably addressed the order properly to the superior train 723 and the operator at Orangeburg," thus making it a 19 order.

There is a suggestion in the transcript of the trial, though the point is not at all presented in the printed argument of counsel for the plaintiff, that the train dispatcher was negligent in sending the meet order to the superior train (723) to be delivered at the meeting point, Orangeburg, in violation of Rule 208:

"A train order must not be sent to a superior train at the meeting point if it can be avoided. When an order is so sent, the fact will be stated in the order and special precautions must be taken to insure safety."

If there was the slightest evidence in the case that the failure, if there was such, to observe this rule had any part in producing the disaster, the point would be worth considering. It could not possibly make any difference that 723 had not received notice of the order before they reached the meeting point, unless the failure to notify them in ad-

vance caused them to run by the meeting point and collide with the train they were expected to meet at some point east of the meeting point. As a fact, the collision occurred west of that point, at a place where 723 had the right to be, even if the order had been received before they left Columbia. Besides, the order which Youngblood received at Branchville and which he had in his pocket when extricated from the wreck notified him that 723 was on the main line; that he must meet it at Orangeburg; and that he must take the side track there, being an inferior train, and allow it to pass, in accordance with Rule 88.

It is clear from the plaintiff's evidence that no negligent act can be charged against Rogers, the train dispatcher at Charleston. He did all that could possibly have been required of him. It is conceded that he sent the order as a 19 order, and that it was "bulled" by Jones, the operator at Orangeburg, into a 31 order. The order was properly sent to Branchville as a 31 order, for that was not the meeting point, and there was only the crew of 483 to receive it. If any one was negligent in the transmission of that order to Orangeburg, it was Operator Jones who received it and transcribed it as a 31 order. "At meeting points between extra trains, the train in the inferior time table must take the siding, unless otherwise provided." Rule——.

If Rule 208, under the circumstances stated, requires "special precautions," I see no reason why this injunction should not apply to the crew of 483, who were informed of the exact situation, as well as to the railway company. They had a copy of the order which showed that 723 was to be notified at Orangeburg of the meet order.

It is insisted next that Jones, the first operator at Orangeburg, was negligent in transcribing the 31—5 copy order transmitted to him as a 31—3 copy order; the consequence of which was that 483 did not get copies of that order which they would have received if the order had been properly transcribed as a 31—5 copy order.

The order in full, as sent by the train dispatcher in Charleston, was as follows:

"18 JD (Orangeburg) 723 east and operator 7. 58 AM. B. V. (Branchville) Eng. 483 1/3/24. Extra 723 east get this order and meet extra 483 west at Orangeburg. Extra 483 run extra Branchville to Andrews."

It seems to be true, at least there is evidence to sustain the fact, that the train dispatcher transmitted this order in the above shape to the Branchville and Orangeburg offices; that it was transcribed by Jones, the Orangeburg operator, with the words "and operator" omitted, and that he left the copies on his desk to be taken up by Tyson, the operator who relieved him on that day. The effect of this omission was to convert what was transmitted as a 31—5 copy order into a 31—3 copy order, with the consequence that Tyson had two copies to deliver to the crew of train 723 and none to the crew of 483; that but for the conversion of the order he would have had two copies to deliver to each crew.

It may be assumed that this was an act of negligence on the part of Jones, but the question remains whether it had any effect upon the lapse of Youngblood in disregarding the plain terms of the meet order which had received in Branchville, and had in his pocket, not superseded, annulled, or fulfilled,. as a proximate cause of his conduct.

It unquestionably caused Tyson, who immediately succeeded Jones in the work of the day as operator, to drop the semaphore board on 483, indicating that he had no orders for them, and amounted to permission for 483 to pass the board. It certainly did this; but what excuse did that give Youngblood for disobeying his meet order? It did not purport to annul that order. That could not be done without a written order, and there is nothing to show that Youngblood thought that it did other than the fact that he went on to his death, which was incompatible with the idea that he had forgotten his order as with his imagining that the order had been repealed. Tyson had no notion that the

order, a copy of which he had, and which he knew was a meet order, had been annulled, and why should Youngblood have thought so? Tyson's apprehension of the situation is shown by his testimony:

"Q. When 723 came in, it would have had the right to have run straight on down to the semaphore board? A. It would have stopped at the east end of the track and come down and got orders. Whenever they have orders, superior train is to stop. * * *

"Q. Mr. Tyson, a train can't pass by your office until you lower the board? A. A train can go up to the pass track without the board being dropped. It can go on up to the pass track. * * *

"Q. In what way did you answer him (the engineer) that morning? A. I dropped the board.

"Q. For what purpose? A. To tell him that I had no further orders for him. * * *

"Q. When you dropped the semaphore and had no further orders for him, he was to head in and do what? A. He was to go to the east end of the pass track and go into the siding.

"Q. That pass track is west of the depot? A. Yes, sir. * * *

"Q. When you let down the semaphore board, that signified no further orders for them, and you assumed that they were going into the passing track which was 75 yards west of your office? A. Yes, sir. * * *

"Q. When that signal was given by 483, you dropped the semaphore board down? A. Yes, sir.

"Q. What did that mean? A. Proceed.

"Q. Where to? A. To the east end of the pass track to go in there. * * *

"Q. Under the yard limit rule, inferior trains are to approach in the yard limits under full control if on main line so that they can stop at any minute, are they not? A. Yes, sir.

"Q. They can go into the east end on the west side of your station full control? A. Yes, sir. * * *

"Q. In the absence of any train order, what track would 483 go in, 723 being the superior train? A. Should have gone into the pass track."

J. B. Witherspoon, fireman on 483, a witness for the defendants, testified:

"The operator (at Orangeburg) gave a clear board.

"Q. What did that mean to you? A. It meant that that office had no orders for us.

"Q. That then meant? A. To proceed on our previous orders.

"Q. Which required you to do what? A. Run extra to Andrews and meet 723 at Orangeburg.

"Q. You should have done what under the previous orders? A. We should have headed into the east end of the pass track. * * *

"Q. Now that order you had, when they cleared you at that station, where were you to go? What did that mean? A. According to that order, we should have headed in the east end of the pass track at Orangeburg.

"Q. In other words, you should have gone in the pass track under that order so that 723 could go by? A. Yes, sir. We were the inferior train."

Mr. King, superintendent, testified:

"Q. After 483 left the packing house track, where was the only place it could go? A. This order, No. 18, required the train to head in the east end pass track. * * * It was the duty of the engineer to call for the board. If he got a clear signal, that was evidence that there were no orders for him. He would then clear the main line at the east end (of pass track) and wait for 723. * * *

"Q. In connection with this order, if it had been a five-copy order, put out as such at Orangeburg, instead of what the agent did get, would that have made any difference in the movement of 483? A. I can't see that it would. * * *

The conductor and engineer of extra 483 had a copy of the order that made a direct meeting point * * * at the pass track at Orangeburg. * * * Trains are not moved by verbal instruction, * * * only under written orders.

"Q. When the board was let down, what did it mean? A. It meant the operator had no orders for them. * * *

"Q. What was the conductor's duty when the semaphore board was let down? A. To go into the pass track and stay there until 723 came by. * * *

"Q. Could the dropping of the semaphore board have interfered with a dead meet order such as this No. 18? A. Not at all."

As the witness for the plaintiff, Pearce testified:

"Q. Mr. Pearce, irrespective of any five-copy order, if Mr. Youngblood had at Branchville, a meet order for the Orangeburg station, insn't it a fact that he should have gone into this sidetrack irrespective of any five-copy order? A. Yes, sir.

"Q. If Conductor Youngblood had in his possession an order given him at Branchville to meet 723 at Orangeburg, and his train had stopped before it reached the station, and the agent had cleared him by the board, having in his possession that order, wasn't it his duty to go into the eastern switch into the passing track? A. Yes, sir; it was * * * (speaking of the semaphore board).

"Q. And down would indicate 'proceed'? A. Yes, sir.

"Q. What would that mean when he had that order in his pocket? A. To go to the east switch to the passing track."

Mr. Rogers, train dispatcher, testified:

"State whether or not if the order transmitted by you from the dispatcher's office in Charleston to Tyson (Jones?) operator, a five-copy order, two for the engineer and conductor of 723 when it arrived in Orangeburg, and the other two for engineer and conductor of 483, when it arrived— state whether or not being a five-copy order would prevent

him from stopping, or relieve him from responsibility to go into the pass track and wait for 723.   A.   None whatever."

Pearce, a witness presented by the plaintiff, testified under examination by counsel for the plaintiff:

"When he (the engineer) blows four, he is asking for a signal from the operator, whether he has any orders for him; and, if the operator has any orders for him, he leaves the semaphore board in position.

"Q. And, if he hasn't any orders for him, he changes it to proceed?   A.  Yes, sir.

"Q. The engineman can't go by as long as the semaphore arms stand out straight at danger?   A. He can go to the pass track.

"Q. As soon as he goes by the semaphore board he is lapping getting into anothers man's territory—isn't he?   A. Unless he goes to the switch.   That clears the main line.

"Q. When he goes by, the operator drops the board, provided he hasn't anything for him?   A. Yes, sir. * * *

"Q. Now, when the engineman blows four blasts for a signal, then the operator drops the red board down, provided he has no orders for him?   A. Yes, sir.

"Q. He can't go by unless it is dropped?   A. Unless it is to clear the main line."

Mr. Rogers, another witness for the plaintiff, the train dispatcher at Charleston, testified:

"Q. Now Mr. Rogers, Mr. Youngblood being in possession of that order, in running his train No. 483, out of Branchville to Orangeburg through Orangeburg wasn't it his duty to go into the pass track and wait for 723 at Orangeburg?   A. Yes, sir."

In answer to a question by the Court, "Why should he have headed into a side track?" the witness replied:

"He held an order not fulfilled, superseded or annulled. * * *

"Q. When the semaphore is down, what does that mean to a train having orders to meet there like Youngblood's and

Dantzler's train had? A. It means that there are no further orders for him.

"Q. Then what should he have done? A. Headed in (the pass track) and fulfilled orders contained in that order. * * *

"Q. A clear board down is an indication for that train to pass on? A. No, sir; not for 483 that morning. The conductor and engineer had a movement order that had not been fulfilled.

"Q. What should he have done? A. Headed in at Orangeburg and gone into the pass track. * * *

"Q. Now Mr. Rogers, if there had been several copies of that order directed to 723 and operator, say five copies, two for engineer and conductor of one train and the other two to the engineer and conductor on 723 when it arrived, would the position have been any different? A. No, sir.

"Q. It wouldn't have been changed any? A. No, sir. * * *

"Under Rule 93 what should he have done? A. Headed in. He had to pass the train order board to get to the east end of the pass track switch and he could do that under the yard rule."

It is impossible that the failure of 483 to receive the duplicate copies of the order, if the order had been transcribed properly as a 31—5 copy order and not as a 31—3 copy order, at Orangeburg, could have induced them to think that the order had been superseded or annulled. If these copies had been delivered to them, they would not have had any more information than they already possessed from the orders which both conductor and engineer had received in Branchville and had in their pocket. Its really was not necessary to make a 31—5 copy order out of the order transmitted to Orangeburg, for its effect would simply have been to supply them with duplicates which they already had.

Counsel for the plaintiff says in his printed argument:

"Evidently they thought that 723 had already come into

the yard at Orangeburg or the meeting point had been changed."

What right did they have to think any such thing? They knew that 723 was the superior train, and that, if it "had already come into the yard at Orangeburg," it would be occupying the main line, that which 483 made use of in leaving Orangeburg. They had no right to think that the meeting point had been changed, for the order which they had in their pockets had not been superseded or fulfilled.

It is argued that that meant an unobstructed passage clear to Andrews. It could not have meant that for he was sent out to relieve a disabled engine at Ft. Motte, which lay between Orangeburg and Andrews, where he was obliged to stop. Huggins, the only witness who approached this interpretation of Tyson's act, says, speaking of the semaphore board:

"Q. When you drop it, what signal is that? A. It gives clearance by that board.

"Q. What is the signal when it is dropped? A. Got no orders.

"Q. What does that signify? A. Gives the right to proceed.

"Q. To where? A. To where orders allow him to go."

It is true he adds that Andrews was where he was allowed by his orders to go, and the inference would be that he intended to testify that the clear board gave Youngblood the right to expect a clear track all the way to Andrews, which, as seen, could not possibly be true. His orders allowed him to go into the pass track at the east switch; in fact, required him to do so; and in doing so he was authorized to pass the semaphore, for the reason that the other train, receiving the red board, was required to stop at the east switch and come in for orders, so that between the semaphore and the east switch was safe territory for 483. The dropping of the board by Tyson therefore could have

meant only: "I have no orders for you; proceed under the orders you have."

Rule 93 provides: " Second and inferior class and extra trains or engines, must move within yard limits prepared to stop unless the main tracks seen or known to be clear"; a rule which amply protected 483 in moving past the semaphore to the east switch for the purpose of entering the pass track against a collision with 723 between those points.

The rules prescribe, in reference to meet orders:

"Trains receiving these orders will run with respect to each other to the designated points and there meet in the manner prescribed by the rules."

Rule 220 provides:

"Train orders once in effect continue so until fulfilled, superseded, or annulled."

Youngblood's conduct in failing to take the pass track, and violating the terms of the meet order which he had in his pocket, and which had not been superseded, annulled, or fulfilled, can only be explained by his forgetting the order, or by his assuming that the dropping of the board on 483 constituted an annulment of it. He knew that a train order could not be superseded or annulled except by another order, in writing. He knew that he had not passed 723; that the order had not been fulfilled. He knew that his train was the inferior train, and that the rules required an inferior train, at a meeting point, to take the pass track. He knew that dropping the board meant only that the operator had no further orders for him than the one he had. He knew that he had the right, in the yard, to pass the semaphore in order to head in to the pass track at the east switch.

The contention that the act of Tyson, in dropping the board on 483, was an annulment of order No. 18, the meet order, is based upon the assumption that Tyson had the power to annul that order; that it was so intended; that, if not so intended, Youngblood was justified in so construing it as an act emanating from the train dispatcher.

As is said *R. Co. v. Wiles,* 240 U. S., 444; 36 S. Ct., 406; 60 L. Ed., 732: "His duty was as clear as its performance was easy. He knew the danger of the situation and that it was imminent; to avert it he had only" to head into the pass track at the east switch and wait there until 723 had passed.

It is again insisted that the failure of Tyson to deliver the verbal message of the train dispatcher: "Clear him and tell him to go to the west end pass track and wait on extra 723," was an efficient cause of Youngblood's running by both east and west switches of the pass track. Clearly this was an order, if it could be so considered, which the train dispatcher ran great risk in giving. Train 723 had the superior right of way from the west switch to the east switch of the passing track, and that message required Youngblood to overlap the territory of 723 to that extent. If the collision had occurred between the two switches, much would have been made and, properly, of the indiscretion in such an order. Tyson would have been entirely justified in refusing to deliver it. Tyson cleared him to do what 483 was authorized under the rule to do; pass the semaphore and head into the east switch. How the failure to extend an order which should not have been given could have caused Youngblood to disobey the meet order, refuse to enter the east switch which rules required him to do, refuse to enter the west switch which he was advised to do, and rush on upon an opposing train, is beyond my comprehension. The Federal authorities are clear upon the point that the disaster was wholly due to the negligence of Youngblood, and that the verdict was properly directed. They seem to go to the extent of holding that, if Youngblood's negligence was sufficient wholly to bring about the collision, the complaint will not be entertained that some one else's negligence induced his negligence.

In the case of *Virginian R. Co. v. Linkous,* 230 F., 88; 144 C. C. A., 386, reaffirmed on rehearing, 235 F., 49;

148 C. C. A., 543, and certiorari denied by Supreme Court, 242 U. S., 630; 37 S. Ct., 15; 61 L. Ed., 537, the intestate was engineer of train 468 moving east, and was killed in a head-on collision with another train 33, moving west. He and his conductor had received a meet order for train 33 at a certain point. Three others, including the conductor, were riding in the cab of the engine, and all had notice of the meet order, copies of which were found upon their persons after the collision. Train 468, of which Linkous was engineer, ran by the meeting point without heeding the meet order, and collided with train 33 a short distance east of the meeting point. It was sought by the plaintiff to sustain her contentions that the collision was not solely the result of the negligence of the engineer by charging the defendant with the negligence of the conductor and the other two employees who were in the cab and had notice of the meet order. The Court denied the contention, holding that the engineer was directly responsible for the collision, and that the plaintiff could not come within the provisions of the Federal Employers' Liability Act by relying upon the alleged negligence of the companions of the engineer.

In *Frese v. R. Co.,* 263 U. S., 1; 44 S. Ct., 1; 68 L. Ed., 131, the intestate was the engineer of a train which collided with another at a grade crossing of the two railroads. Both trains stopped in compliance with the Statute, but, the view being obstructed, and not knowing of the other train's presence, the engineer pulled ahead and collided with it at the crossing, resulting in his death. The plaintiff contended that she was entitled to recover under the Federal Employer's Liability Act upon the ground that there was evidence of negligence on the part of the fireman in not discovering the presence of the other train; and that, even if Frese was negligent, such negligence would not completely bar a recovery. The Court held that there was no evidence of negligence on the part of the fireman, and, if there had been, the result would have been the same saying:

6—S. C. 137

"Moreover, the Statute makes it the personal duty of the engineer positively to ascertain that the train can safely resume its course. Whatever may have been the practice, he could not escape this duty, and it would be a perversion of the Employers' Liability Act, * * * to hold that he could recover for an injury primarily due to his failure to act as required, on the ground that possibly the injury might have been prevented if his subordinate had done more."

Manifestly the word "subordinate," used in this last sentence, is merely a term of identification. The meaning would have been the same if the word "fireman" had been used. If the conductor had been his companion, the rule would have been the same, as in the *Linkous case,* although not a subordinate.

In *Davis v. Kennedy,* 266 U. S., 147; 45 S. Ct., 33; 69 L. Ed., 212, where a railway collision, killing an engineer, was directly due to neglect of his personal duty not to move his train forward without positively ascertaining that another train had passed, the possibility that the accident might have been prevented but for contributory negligence of other members of the crew in not performing the lookout duty which they shared with him will not sustain an action by his representative against the carrier under the Federal Employers' Liability Act. The Court said:

"'The trial was in a Court of the State of Tennessee, and the plaintiff got a judgment which was sustained by the Supreme Court of the State on the ground that the other members of the crew as well as the engineer were bound to look out for the approaching train, and that their negligence contributed as a proximate cause to the engineer's death. We are of opinion that this was error. It was the personal duty of the engineer positively to ascertain whether the other train had passed. His duty was primary as he had physical control of No. 4, and was managing its course. It seems to us a preversion of the Statute to allow his representative to recover for an injury directly due to his failure

to act as required on the ground that possibly it might have been prevented if those in secondary relation to the move-ment had done more."

In *Washington Co. v. Cook* (Md.) 125 A. 172, the motor-man of a work train was injured by reason of his disregard of orders to clear for regular train. It was held that the railroad company cannot be held responsible under the Federal Employers' Liability Act because the conductor did not detect the mistake in the answer of the motorman to the conductor's question as to when the next train would be due.

In *McDonald v. R. Co.* (Minn.), 207 N. W., 194 (decided January 29, 1926), the engineer was killed in a head-on collision. He and the conductor had both received a meet order. Before the train which they were to meet at a certain station had arrived, the engineer signaled the conductor that he was ready to proceed. The conductor signaled him ahead. Both had forgotten their orders. The plaintiff sought to come within the protection of the Federal Em-poyers' Liability Act by reliance upon the negligence of the conductor in signing the engineer ahead, as contributory "in part" to the disaster. The plaintiff had a verdict in the trial Court, and, upon appeal, the Supreme Court re-versed the judgment of the trial Court, and directed judg-ment for the defendant, saying:

"Both the engineer and conductor had a duty, personal to himself, to see to it that order 56 was not violated. Its violation by McDonald [the engineer], in the absence of some other intervening and efficient cause, was negligence, which continued to the place of the collision, and was the producing cause of the accident. The fact that McCabe [the conductor] was also guilty of negligence in his silent permission in allowing the engineer, who was the primary wrongdoer, to violate the order, will not permit plaintiff to recover upon the theory that McCabe's negligence was a contributing cause. To so hold would permit the anomaly

of an employee violating orders proximately resulting in his own injury to recover upon the theory that if some other employee had done his duty and prevented the violation the injury would not have occurred."

In *Davis v. Sorrell*, 213 Ala., 191; 104 So., 397, a switchman was crushed in a collision between the train on which he was riding and cars which he had switched to an adjacent track. The plaintiff contended that it was alike the duty of the foreman of the crew to see that the cars on the side track were "in the clear." The Court held that the primary duty of placing the cars "in the clear" was upon the plaintiff switchman, and that, the duty of the foreman in this respect being only secondary, his negligence was not a basis of recovery under the Federal Employers' Liability Act, citing the *Linkous, Kennedy* and *Frese cases* from the Federal Courts.

MR. ACTING ASSOCIATE JUSTICE PURDY (dissenting) : I regret that I cannot concur in this opinion. While the rules require extra precautions in the execution of most orders of this kind, the failure to furnish Youngblood with a copy of the order at Orangeburg did not mislead or deprive him of any protection. He had an order to take the side track, not annulled or superseded, and he alone could fufill the order, and it was his duty to have fulfilled it; and, according to the testimony of Witherspoon, he consciously disobeyed the order, and assumed the risk of going to another point, and brought about the catastrophe resulting in his death. Were there a single fact to controvert this, it would be my duty to concur; but, there being no dispute as to the facts, it only remains to apply the law as applicable to the rules under which he was working to the admitted force of such rules, viz.: that, when ordered to take the side track at Orangeburg in the absence of an annulment, or a modification, he was obliged to do so. He not only failed to fulfill the order, but, as stated, consciously disobeyed it. It is suggested that, if a copy of the order as sent from Charleston

had been given Youngblood at Orangeburg, and if the agent had directed him to take the side track, the catastrophe would not have happened. He had this identical direction in the orders on his person, and he would not have any annulment or any modification of that order. While not relating to the same subject, it is analogous in principle to giving signals at a crossing. These signals are given as a warning to the public of the dangers of the crossing on account of passing trains. It has been repeatedly held by this Court that, if a person sees a train, a failure to give the signals cannot be a basis of recovery because the person had actual knowledge of the presence of the train; and the giving of the signals would not have added to the information which he had from seeing the train. So, here, Youngblood had in his possession all the formation in his order that it is suggested he should have had from getting a copy of an order at Orangeburg, and from a further direction from the agent there to take the side track—directions purely cumulative—disclosing nothing more than he knew, and in no way changing, or doing away with his orders, which he was bound to obey at his peril.