GREAT NORTHERN RAILWAY COMPANY *v.* WILES, ADMINISTRATOR.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 196.    Submitted January 26, 1916.—Decided March 20, 1916.

Where there is nothing to extenuate the negligence of the employé, or to confuse his judgment, and his duty is as clear as its performance is easy, and he knows not only the imminent danger of the situation, but also how it can be averted by complying with the rules of the employer, there is no justification for a comparison of negligences on the part of the employer and employé or the apportioning of their effect under the provision of the Employers' Liability Act. To excuse such neglect on the part of an employé of an interstate carrier would not only cast immeasurable liability on the carriers but remove security from those carried.

In such cases it is disputable whether the doctrine of *res ipsa loquitur* applies at all; and, in this case, *held* that the submission to the jury of whether negligence of the carriers existed as a deduction from the fact that a draw-bar pulled out from causes not shown by the testimony, and the proportion of the carrier's negligence in causing the death of an employé was, in view of the failure of the employé to perform his duty and comply with the rules of the employer under such circumstances, reversible error.

125 Minnesota, 348, reversed.

THE facts, which involve the construction and application of the Federal Employers' Liability Act and the valid-

ity of a judgment in an action thereunder, are stated in the opinion.

*Mr. E. C. Lindley* and *Mr. M. L. Countryman* for plaintiff in error.

*Mr. W. R. Duxbury* and *Mr. Lyle Pettijohn* for defendant in error.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Action for damages for the killing of one Dennis E. Wiles, brought by the administrator of his estate, who is also his father and next of kin. It was brought under the Employers' Liability Act of April 22, 1908 (35 Stat. 65, c. 149), as amended April 5, 1910 (36 Stat. 291, c. 143).

Wiles was a freight brakeman in the employ of the railway company in interstate commerce, the company being an interstate common carrier.

There was a verdict for plaintiff in the sum of $650. Upon motion of defendant the court, expressing the view that Wiles' negligence was the proximate cause of the accident which resulted in his death, rendered judgment that, notwithstanding the verdict, plaintiff take nothing by his action, that the same be dismissed, and that the railway company recover of plaintiff $36.52 costs.

The judgment was reversed by the Supreme Court of the State and judgment ordered to be entered on the verdict.

The only issue is as to the negligence of the railway company and the contributory negligence of the deceased and the causal relation, if either existed, to the death of the deceased.

The determining facts of the case are as follows:

Deceased was a rear brakeman on a freight train of the railway company proceeding easterly between Grotto and

Skykomish, Washington. After having passed a curve in the road the train broke in two by the drawbar pulling out of the sixth car from the engine, which caused the train to stop instantly. It was run into shortly after (from 3 to 5 minutes, it was testified) by a passenger train drawn by two engines. The night was pretty dark and the weather a little misty. At the place of collision the track was obstructed by a very sharp curve and a bluff on the right hand side for about five box car lengths, and the rear end of the freight train at that place could not be seen more than five box car lengths away. On the left hand side of the engine, which is the fireman's side, the track could not be seen more than a car length ahead because that would be on the outside of the curve. The engineer of the passenger train did not know of the existence of the freight train ahead and no negligence is attributed to him. The deceased and the conductor of the freight train were in the caboose and both were killed. What caused the pulling out of the drawbar was not shown, nor was there proof that it was defective or that the company was negligent in the care or use of it.

The head brakeman of the freight train testified that the train stopped immediately upon the pulling out of the drawbar, that he descended from the train and hastened back to the caboose for a chain and that he saw the headlight of the passenger train as it came around the curve. He further testified that it was Wiles' duty to have gone back to protect the rear end of his train at the time the passenger train was due out of the station in the rear, and that this applied whether the delayed inferior train which was ahead was running or standing still; that it was the duty of Wiles to have gone back a sufficient distance to guarantee full protection to the rear of his train, and that the engineer of the freight train, at the time the train broke in two, signaled the rear brakeman to go back and protect the rear end of his train. The same testimony as

to the duty of Wiles was given by another witness. It appeared also from the testimony that the freight train was losing time by slipping and that Wiles knew the time that the passenger train was due to leave Grotto station and he should have dropped off or dropped fusees on the track to notify the engineer of the passenger train that the freight was running slow. The fusees are of red and yellow lights; the red means to stop for ten minutes, the yellow means to bring the train under control and keep it under control until the next station is reached.

The rules of the railway company were put in evidence as follows:

"Rule 99. When a train stops or is delayed by any circumstance under which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled he may return to his train, first placing two torpedoes on the rail six rail lengths apart, or a lighted fusee in the center of the track when conditions require."

"Rule 100. If the train should part while in motion trainmen must, if possible, prevent damage to the detached portions. The signals prescribed by 13D and 15F must be given."

13D is the lantern signal or hand signal, either one; 15F is the whistle signal. Rule 100 applied to what should be done by the members of the train crew for the protection of the separated portions of the train itself. Rule 99 applied to what should be done for the protection of other trains approaching.

The Supreme Court applied the rule of *res ipsa loquitur* and justified a submission to the jury of the negligence of the railway company as a deduction from the pulling out of the drawbar and the proportion of its causal relation to the death of Wiles to the amount of negligence attributable to him, and reversed the action of the trial court entering judgment for the company notwithstanding the verdict.

The application of the doctrine to cases like that at bar is disputable. *Patton* v. *Texas & Pacific Ry. Co.*, 179 U. S. 658; *Looney* v. *Metropolitan R. R. Co.*, 200 U. S. 480, 486. We, however, do not have to go farther than to indicate the dispute. The case at bar is not solved by the doctrine. There is no justification for a comparison of negligences or the apportioning of their effect. The pulling out of the drawbar produced a condition which demanded an instant performance of duty by Wiles, a duty not only to himself but to others. The rules of the company were devised for such condition and provided for its emergency. Wiles knew them and he was prompted to the performance of the duty they enjoined (the circumstances would seem to have needed no prompting) by signals from the engineer when the train stopped. He disregarded both. His fate gives pause to blame, but we cannot help pointing out that the tragedy of the collision might have been appalling. He brought death to himself and to the conductor of his train. His neglect might have extended the catastrophe to the destruction of passengers in the colliding train. How imperative his duty was is manifest. To excuse its neglect in any way would cast immeasurable liability upon the railroads and, what is of greater concern, remove security from the lives of those who travel upon them; and therefore all who are concerned with their operation, however high or low in function, should have a full and an anxious sense of responsibility.

In the present case there was nothing to extenuate Wiles' negligence; there was nothing to confuse his judgment or cause hesitation. His duty was as clear as its performance was easy. He knew the danger of the situation and that it was imminent; to avert it he had only to descend from his train, run back a short distance, and give the signals that the rules directed.

*Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.*