## DOUGLAS v. WASHINGTON TERMINAL CO.

(Court of Appeals of District of Columbia. Submitted March 4, 1924. Decided April 7, 1924.)

No. 4017.

1. **Master and servant ⊙139—Brakeman's act in attempting to cross between cars held proximate cause of injury.**

Evidence that brakeman, at car inspector's request, signaled engineer for slack, so that train could be divided, and, inspector not having set brakes on rear section, when train began reversing, rear section drifted about three feet from front section, and brakeman was mashed to death while attempting to cross track between two sections, *held* to show that brakeman's movement across track was intervening proximate cause between failure to set brakes and his death.

2. **Master and servant ⊙137(6)—Car inspector, assisting in switching operation, held not negligent as to brakeman, caught between cars.**

In action for brakeman's death between two cars, evidence that inspector's act in applying brakes to car that was drifting, and brakeman's act in attempting to cross between drifting car and train pushing cars in same direction, was practically simultaneous, and inspector did not, and could not in exercise of due diligence, see brakeman in position of danger, *held* not to show that inspector was negligent.

3. **Master and servant ⊙137(6)—Operation of engine held not negligent as to brakeman caught between cars.**

Evidence that train moved backwards in response to brakeman's signal, and so far as evidence showed neither engineer nor fireman saw brakeman when he went between the two cars and was killed, *held* not to show negligence on part of engineer or fireman.

4. **Master and servant ⊙265(2) —Burden of issue of negligence under federal act on plaintiff.**

In action for brakeman's death, plaintiff has burden of proving negligence on part of defendant's employees as charged in the declaration, in view of Employers' Liability Act (Comp. St. §§ 8657–8665).

5. **Evidence ⊙368(1)—Refusal of plaintiff's demand for stenographic notes taken at coroner's inquest held within court's discretion.**

In action for brakeman's death, refusal of plaintiff's demand for an inspection of stenographic notes, taken by defendant's stenographers at examination of witness before coroner's jury, *held* within trial court's discretion.

6. **Witnesses ⊙236(1)—Refusal to permit certain question as to willingness to give information held within court's discretion.**

In action for brakeman's death, refusal to permit plaintiff to question witness whether he had given statement to defendant's agent before trial, and refused to give a statement to plaintiff's agent, *held* within court's discretion.

7. **Trial ⊙147—Having jury render verdict subject to ruling on questions of law held within court's discretion.**

In action for brakeman's death court's refusal to have jury render verdict, subject to ruling of court on questions of law, *held* within court's discretion.

Appeal from the Supreme Court of the District of Columbia.

Action by John L. Douglas, administrator of the estate of David Benjamin Douglas, deceased, against the Washington Terminal Company. From a judgment entered on a verdict directed for defendant, plaintiff appeals. Affirmed.

⊙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Wilton J. Lambert, R. H. Yeatman, Richard A. Ford, and W. Cameron Burton, all of Washington, D. C., for appellant.

George E. Hamilton, John J. Hamilton, George E. Hamilton, Jr., Edmund Brady, and Henry R. Gower, all of Washington, D. C., for appellee.

Before SMYTH, Chief Justice, VAN ORSDEL, Associate Justice, and MARTIN, Presiding Judge of United States Court of Customs Appeals.

MARTIN, Acting Associate Justice. [1] The administrator of the estate of David Benjamin Douglas, deceased, as plaintiff below, sued the Washington Terminal Company, as defendant, to recover damages because of the death of the intestate, occurring on July 25, 1922, at the Union Station in Washington, D. C., which according to plaintiff's claim resulted from the negligent acts and omissions of defendant's employees, while the deceased was acting as an extra conductor and brakeman in the employ of the defendant. The plea was the general issue. At the conclusion of the plaintiff's evidence the trial court directed a verdict for the defendant, and the plaintiff appealed.

The Washington Terminal Company is a corporation, with the rights and obligations of a common carrier, owning and operating the Union Station at Washington, D. C., having contracts with various railroad companies, among them the Pennsylvania Railroad Company, whereby they use the terminal facilities of the defendant company in the city of Washington. McNamara v. Washington Terminal Co., 37 App. D. C. 384. The plaintiff's evidence tended to prove the following facts:

On and before July 25, 1922, the Pennsylvania Railroad Company operated a regular passenger train, No. 183, between the cities of New York and Washington, arriving at the Union Station in Washington at 9:10 o'clock p. m. On that day the train arrived on time, and entered the station upon track 18. After the passengers were discharged, the Pullman sleepers were cut off from the rear end of the train, and were shifted to another part of the station. The remainder of the train consisted of the engine, a baggage car, a postal car, and several passenger coaches. It was next required that the baggage and postal cars should be cut out of the train, and switched over to track 19, which was the track next east of 18. The regular procedure for this purpose was first to back the train on track 18 to a point beyond the cross-over switch and there disconnect the coupling between the postal car and the foremost coach, thus cutting the train into two sections; then to move the forward section to a position ahead of the switch, from which point the baggage and postal cars could be shunted across the connecting track to a position upon track 19. In order to uncouple the train between the two cars as aforesaid, it was necessary first to close the air line under the postal car, which was done by turning an angle cock located upon the right-hand side at the rear end of the car, about a foot below the car platform, then to close a similar angle cock under the left side of the front end of the coach, and next to disconnect the air hose coupling

which passed under the bumpers between the two cars. Two additional operations must follow, to wit, drawing the coupling pin, and reopening the angle cock under the coach, in order thereby to set the air brakes upon the rear cars, so as to prevent them from drifting backwards. It was the usual practice to open this angle cock before drawing the coupling pin, thus making fast the rear section before disconnecting the train.

On the evening in question there were four employees who were engaged in this operation. Two of them were the regular train engineer and the fireman of train 183. Another was the decedent, David Benjamin Douglas, then serving as extra yard conductor and brakeman in the employ of the Terminal Company. The fourth was one Lynch, a car inspector and repair man employed by the same company, whose duty it was to assist the yard conductor in cutting the train in the manner described. There is no evidence in the record to impeach the general competency of any of these employees. Accordingly, after the passengers had alighted and the Pullman cars had been detached, the remainder of the train was moved back upon track 18 to a point clear of the cross-over switch, whereupon Douglas, who had charge of the operation, ordered Lynch to "cut the train." The two men were then standing upon the platform immediately west of the train, at a point near the coupling between the postal car and the foremost coach, at which point the cut was to be made. Thereupon Lynch closed the angle cock in the air line under the rear end of the postal car, and next crept under the bumpers and crossed to the opposite side of the track, where he closed the angle cock under the front end of the coach. He then uncoupled the air hose, and attempted to pull the coupling pin by means of the lever provided for that purpose. He found, however, that the pin was held fast by the tautness of the train, so he called to Douglas to signal for slack. Douglas accordingly signaled to the engineer by means of two successive signals, which were practically continuous, and which signified that the engine should first back and then reverse and go forward. This was the customary signal for slack under such circumstances.

In response the fireman, who was then in charge of the engine, slowly backed the train a distance of about three feet, and so soon as the cars were in motion Lynch pulled the coupling pin, thereby dividing the train into two sections. In this instance, however, Lynch had not opened the rear angle cock before drawing the coupling pin; consequently the air brakes upon the rear cars were still off, and the rear section began to drift slowly backwards toward the yard. When Lynch saw that the section was drifting, he was about three feet distant from the angle cock under the passenger coach; he quickly took a step forward and opened it, thus instantly bringing the section to a stop. The rear section had moved about three feet after it was uncoupled and before it was stopped; the forward section however, under control of the engine, continued for a few feet to move slowly backward. During the time that Lynch had been engaged in this operation Douglas remained upon the platform on the west side of the train, but when the rear section began to drift he

suddenly sprang upon the track between the two moving sections, doubtless intending to cross over to the rear angle cock, so as to open it in order to set the brakes. Lynch, however, being on that side of the cars, had already reached the angle cock, and was in the act of turning it when Douglas started to cross the track. The rear cars were thus suddenly brought to a standstill, the two sections being then about three feet apart, with the forward section still moving backwards as aforesaid, and with Douglas attempting to cross between the two. He was thus caught between the bumpers of the cars, and was instantly killed. There is no evidence that either of the two men spoke to the other at the time of the immediate accident. In the meantime the engine, according to routine, reversed and moved forward, and after coming to a stop beyond the switch the engineer learned for the first time of Douglas' injury.

[2] The appellant claims that this testimony tends to prove negligence upon the part of Lynch in two particulars: First, that he drew the coupling pin without having first opened the rear angle cock, so as to set the rear air brakes and thereby prevent drifting; and, next, that he suddenly opened the angle cock and abruptly stopped the movement of the rear cars, while Douglas was on the track between the two sections, thus exposing him to fatal danger, when Lynch either saw him there, or by the exercise of reasonable care could have so seen him. With respect to the first of these charges we may say that the drifting movement of the rear section was not in fact or law the proximate cause of Douglas' injury, since a new and independent cause, to wit, Douglas' movement across the track, intervened between the two events, and became the efficient and proximate cause of the injury. Therefore the plaintiff was not entitled to recover upon that ground.

The other charge against Lynch was wholly unsupported by the evidence. The record unmistakably discloses that the action of Lynch when he turned the angle cock to stop the rear cars, and the action of Douglas when he started across the track, were practically simultaneous. Accordingly Lynch did not then see Douglas in a position of danger, nor could he have done so by the exercise of reasonable care. It was the urgent duty of Lynch under the circumstances to stop the drifting cars as quickly as possible, and of course Douglas knew this. He also knew that Lynch was near the rear angle cock and could quickly open it. Up to that time Douglas had taken no part in the manual operation aforesaid; therefore his sudden movement to cross the track under the circumstances was unexpected, and indeed unaccountable, and the conclusion cannot be avoided that in legal effect he assumed the risk of the obvious danger which he thus voluntarily and unnecessarily encountered.

The appellant also charges negligence upon the part of the engineer and fireman in permitting the engine and cars "to run or drift backwards without giving any warning, signal, or notice of the fact," and also by permitting them to move backwards after the engineer and fireman saw, or by the exercise of reasonable care could have seen, that Douglas had entered upon the track, and was thus in a

position to sustain serious injury, if the engine continued to move backwards. The record, however, does not tend to sustain these charges. In the first place, it appears that the engineer and fireman, when handling the train aforesaid, were acting in the service and employment of the Pennsylvania Railroad Company, and not as employees of the Washington Terminal Company, although necessarily observing the signals and regulations of the latter company for the concurrent use of the station by the various companies. The agreement existing between the several companies is in the record, and is not inconsistent with this conclusion. Jennings v. P., B. & W. Ry. Co., 29 App. D. C. 219; Kastl v. Wabash R. Co., 114 Mich. 53, 72 N. W. 28; Standard Oil Co. v. Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed. 480; Robinson v. B. & O. R. R. Co., 237 U. S. 84, 35 Sup. Ct. 491, 59 L. Ed. 849; Hull v. P. & R. Ry. Co., 252 U. S. 475, 40 Sup. Ct. 358, 64 L. Ed. 670; Central R. Co. of New Jersey v. De Busley (C. C. A.) 261 Fed. 561.

[3] And, again, the record fails to disclose any actual negligence upon the part of either the engineer or fireman. The train was moved backwards in response to the signal of Douglas himself, and this was done in the usual manner. No signal from the engine was necessary or expected, and so far as the record discloses neither the engineer nor the fireman saw, or in the exercise of reasonable care could have seen, the action of Douglas when he suddenly and unexpectedly started across the track between the two moving sections of cars.

[4] The burden rested upon the plaintiff to prove negligence upon the part of defendant's employees as charged in the declaration. The evidence, however, failed to make a prima facie case upon this point, and accordingly the defendant was entitled to a directed verdict. See Employers' Liability Act (Comp. St., §§ 8657–8665); Great Northern Railway Co. v. Wiles, Adm'r, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. Ed. 732; Washington Southern Railway Co. v. Smith, 45 App. D. C. 192; Seaboard Air Line Railway v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; McCalmont v. Pa. R. R. Co. (C. C. A.) 283 Fed. 741; Pheasant v. Director General (C. C. A.) 285 Fed. 342.

[5] In the course of the trial the plaintiff demanded an inspection of certain stenographic notes which had been taken by the defendant's stenographers at the examination of the witness Lynch before the coroner's jury. The trial court refused to make such an order.

[6] The plaintiff also sought to question Lynch whether he had given a statement to the defendant's agent before the trial, and refused to give a statement to the plaintiff's agent. The court sustained an objection to these inquiries.

[7] The court also refused to have the jury render a verdict subject to the ruling of the court upon questions of law. These rulings are now assigned as errors. We think, however, that the subjects were within the discretion of the trial court, and that the rulings were not erroneous.

The judgment is affirmed, with costs.