## MISSOURI PAC. R. CO. v. JONES.
### (No. 3609.)

Court of Civil Appeals of Texas. Texarkana.
Dec. 11, 1928.

Rehearing Denied Jan. 10, 1929.

'Leake, Henry, Wozencraft & Frank, of Dallas, for appellant.

Jones & Jones, of Marshall, and Wright Patman, of Texarkana, for appellee.

HODGES, J. J. L. Peace, a locomotive engineer, was killed in a collision between two of appellant's trains on the main line near the town of Norphlet, Ark. At the time of the collision, Peace was one of the appellant's engineers and in charge of engine No. 95, which was moving south pulling three tank cars. Engine No. 1278 was backing north on the same track, pulling several box cars attached to its front end. Both trains were intending to take a siding in order to allow another train to pass which was due within a few minutes. The two trains above mentioned came together on a curve in the track. As a result, Peace was killed. He left a wife and some minor children. This suit was filed by Franklin Jones as administrator of the estate of Peace, to recover damages. It is conceded that the colliding trains were engaged in interstate commerce, and that the rights and liabilities of the parties are gov-

erned by the Federal Employers' Liability Act (45 USCA §§ 51–59).

The proof shows that at the time the collision occurred a brakeman was riding in the engine cab with Peace (the engineer) and the fireman. The administrator charged negligence on the part of the crew operating engine No. 1278, and also charged negligence on the part of the fireman and brakeman who were in the cab with Peace, in failing to keep a lookout for trains approaching from the opposite direction. Among the regulations adopted and promulgated by the appellant was rule No. 93, which is as follows:

"Rule 93. Within the yard limits the main track may be used, protecting against first-class trains. Second and inferior class and extra trains must move within yard limits prepared to stop unless the main track is seen or known to be clear."

It is admitted by both parties to this suit that the above rule was applicable to both of those trains at the time the collision occurred. They were of the same class and were moving on the main line within the yard limits of Norphlet. It was the duty of each crew to observe and obey that rule.

On special issues submitted, the jury found the following facts:

"1. That the operatives of the train drawn by engine No. 1278 at the time and just before the collision were violating Rule 93, and that this violation of the rule was a proximate cause of the collision with the train drawn by engine No. 95.

"2. That Peace, in operating engine No. 95 and just before and at the time of the collision, was also violating Rule 93, and that such violation contributed to cause the collision.

"3. That the fireman on engine No. 95 was not guilty of negligence in failing to observe the approach of engine No. 1278; but that the brakeman, Harvey, who was riding in the cab with Peace, was guilty of negligence in failing to keep a lookout for approaching trains, and that such negligence was a proximate cause of the collision."

In response to other interrogatories the jury assessed the total damages resulting from the death of Peace at $23,738. They fixed the amount due to his contributory negligence at $7,913. Upon those answers the court rendered a judgment against the appellant for $15,825.

The sufficiency of the evidence to support the special findings of the jury is not questioned in this appeal. The appellant, however, claims that it was entitled to a peremptory instruction in its favor, or a judgment notwithstanding the findings of the jury. That contention is based upon the proposition that the evidence as a whole conclusively showed that the death of Peace was primarily due to his own negligence in failing to comply with the rules of the company. As supporting that contention, appellant refers to several cases decided by the United States Supreme Court, among which are the following: Davis v. Kennedy, Admx., 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212; Frese v. Chicago, B. & Q. R. Co., 263 U. S. 1, 44 S. Ct. 1, 68 L. Ed. 131; Chesapeake & O. R. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; Toledo, St. L. & W. R. Co. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513.

The case of Davis v. Kennedy was an action for the death of an engineer caused by the collision between two trains going in opposite directions. The collision occurred at a point west of a place known as "Shops." Kennedy, the engineer who was killed, was in charge of train No. 4. The evidence showed that, before reaching Shops, the conductor told Kennedy that the train was crowded, and asked Kennedy to look out for train No. 1, and this Kennedy agreed to do. However, he ran his train on beyond Shops without ascertaining whether or not No. 1 had passed, and the collision occurred. The administratrix of Kennedy's estate recovered a judgment in a trial court of Tennessee, which judgment was affirmed by the Supreme Court of that state. In reversing the judgment of the Tennessee courts, the Supreme Court of the United States used this language: "It was the personal duty of the engineer [Kennedy] positively to ascertain whether the other train had passed. His duty was primary as he had physical control of No. 4, and was managing its course. It seems to us a perversion of the statute to allow his representative to recover for an injury, directly due to his failure to act as required on the ground that possibly it might have been prevented if those in secondary relation to the movement had done more."

Frese v. C. B. & Q. R. Co. is another case in which the administratrix sought to recover damages under the Federal Employers' Liability Act for the death of an engineer, Frese, resulting from a collision. It appears from the evidence that the accident occurred in the state of Illinois, at a point where the track of the Chicago, Burlington & Quincy Railroad crossed that of the Wabash. A statute of Illinois required that "all trains running on any railroad in this state, when approaching a crossing with another railroad upon the same level, or when approaching a swing or drawbridge, in use as such, shall be brought to a full stop before reaching the same, and within eight hundred (800) feet therefrom, and the engineer or other person in charge of the engine attached to the train shall positively ascertain that the way is clear and that the train can safely resume its course before proceeding to pass the bridge or crossing." (Hurd's Rev. St. 1921, c. 114, § 75.)

Frese, the engineer who was killed, was in charge of the Chicago, Burlington & Quincy train. He stopped his train about 200 feet from the crossing. The train on the Wabash stopped about 300 feet from the crossing.

The view of the Wabash track from the Chicago, Burlington & Quincy track at that point was partially obscured until the Wabash track was reached. The two groups of trainmen did not discover each other, but proceeded over the crossing, resulting in the collision which killed Frese. The Supreme Court of Missouri denied a recovery, and that judgment was affirmed by the Supreme Court of the United States. In disposing of the controlling question, the court said: "The plaintiff contends that there was evidence of contributory negligence on the part of the fireman, Savage, and therefore, that, even if Frese was negligent, that would not be a bar to this action under the Employers' Liability Act. But the only evidence as to the fireman came from a man who was standing on the ground as the engine passed him. He says that it looked to him that the fireman then was looking through the front window at that time and that he continued in that position up to say fifty or sixty feet from the crossing of the tracks."

After referring to some facts which tended to excuse the fireman from negligence, the court continued: "Moreover, the statute makes it the personal duty of the engineer positively to ascertain that the train can safely resume its course. Whatever may have been the practice, he could not escape this duty, and it would be a perversion of the Employers' Liability Act * * * to hold that he could recover for an injury primarily due to his failure to act as required, on the ground that possibly the injury might have been prevented if his subordinate had done more."

In the Nixon Case, the foreman of a section gang was killed while riding in a velocipede, going to his work. He commonly used the velocipede in going over the track for the purposes of inspection, and secured permission from his superior to use it in going to and from his work. He was overtaken and killed by a train as he was going from his home to his work. The Supreme Court held that the regulations of the company made it his duty to look out for his own safety while on the track. The evidence in that case showed that the engineer and fireman for some reason did not discover the presence of Nixon on the track in time to avoid the injury. The court apparently concluded that the engineer and fireman owed Nixon no duty to discover his presence, and for that reason Nixon's injury was due solely to his own failure to keep a lookout for trains.

The case of Great Northern R. Co. v. Wiles, 240 U. S. 444, 36 S. Ct. 406, 60 L. Ed. 732, is also referred to. That is a case in which suit was brought for the death of a brakeman who was killed in a caboose standing on the main line of the railroad. The evidence showed that the train to which the caboose was attached had separated between stations on account of some defect in the coupling appliance. The rules of the company made it the duty of the brakeman, when such an occurrence took place, to go back over the track a sufficient distance to give warning to approaching trains. This duty the brakeman in that instance made no attempt to perform. The court held that his injury was, under the circumstances, due to his own failure to obey the regulations of the company, and that the latter was not liable.

■ It is not to be inferred from the above decisions that the Supreme Court intended to nullify any part of the Employers' Liability Act, which permits the recovery of damages in behalf of an injured employee notwithstanding his contributory negligence. It seems that the court merely intended to hold that no recovery should be allowed in those cases where the negligence of the injured employee was the sole cause of the injury, or when, but for his negligent failure to discharge a positive duty, the injury would not have occurred. In each of the cases before referred to it conclusively appears from the record that, if the injured employee had done his plain duty, the collision between the trains would not have occurred. If, under the facts in this case, it conclusively appears that, if Peace had obeyed rule 93, either by keeping a lookout or by reducing the speed of his engine, the collision would have been averted, we should feel impelled to say that his employer is not liable. But we do not think that conclusion is required by the evidence. The testimony shows that engine No. 95 had started south from a point referred to as "All Gulf Siding." It had gone to that place for the purpose of picking up some tank cars to be incorporated in a train to be made up at Norphlet. The track from All Gulf Siding, for a distance of about three-quarters of a mile ending at what is called "Richie Crossing," described a curve to the west. Peace, the engineer, was on the outside of that curve. There was testimony tending to show that he could see only a few feet in front of his engine while going around the curve. The fireman, whom the jury exonerated, was engaged in putting coal into the furnace. The brakeman, Harvey, was in the cab, on the same side with Peace. Those two had been engaged in a conversation just prior to the collision. The fireman on engine No. 95 testified as follows:

"On that day we had been down to All Gulf rack, used to load oil, north of Norphlet. We got three cars down there, and were coming back to Norphlet, which is south from All Gulf. I guess after we passed the passing-track north of Norphlet I got down to put in the fire—the passing-track is F. X. siding. After I got down to put in fire the brakeman took a drink of water and come up to where the engineer was. I said to the engineer and both of them, 'What are we going

to do?' And he said, 'We are going to take these three cars to Norphlet and wait for the special that is due in Norphlet at 4:30, coming from the north, and make up a train and go to town.' I started putting in fire about that time, and he and the brakeman started talking. When I got the fire in and got on my seat I looked out and saw 1278. It was about two hundred and fifty feet from me, and I hallooed, 'Look out!' He looked out his window to see what I was hallooing about, and I said, 'Hold the engine,' and I started toward him. He throwed the engine in reverse and applied the brakes and run on my side. I started on his side—the brakeman got in front of me. I went out the gangway, and there it got us both. When I knew anything they were chopping the cab off me. Before I got down to shovel coal I said, 'I am going to put in fire, and watch out around there.' The engineer nodded at me, but didn't say anything."

The testimony further shows that the train drawn by engine No. 1278, going north toward the All Gulf Siding, was moving backward, with several cars attached to its front end. The conductor of that train testified that he took a position on the north end of the tender, for the purpose of keeping a lookout for trains approaching from that direction. Both he and his engineer knew that engine No. 95 was somewhere to the north. The conductor testified further that he saw engine No. 95 approaching from the north some distance, estimated at about a quarter of a mile, before the collision occurred. He concluded, he said, that the crew in charge of engine No. 95 saw his train and would stop. Upon discovering that engine No. 95 would not stop, he signaled his engineer to slow down, which was done. Later, when he saw that a collision was inevitable, he gave the signal to stop, and then jumped from the tender. While this witness testified that his train was under control before and at the time the collision occurred, other witnesses testified to the contrary. The fireman and brakeman riding in the cab with Peace testified that engine No. 95 was traveling at 12 or 15 miles per hour. Appellant introduced testimony tending to show that it was traveling at a much greater rate of speed. Witnesses who were on the highway near the track and who saw the collision testified that the two trains were going at about the same rate of speed. It was probably that testimony which influenced the jury in concluding that those in charge of engine No. 1278 were guilty of violating rule 93.

■ In considering the controverted issues of fact, we must accept as true that testimony which tends to support the verdict of the jury and the judgment of the court. But the following facts were conclusively established upon the trial: That both Peace and the brakeman, Harvey, disregarded rule 93 in the operation of engine No. 95. It is true

the testimony offered by the appellee tended to prove that Peace, being on the outside of the curve, could see only a short distance in front of his engine; and it is argued that for that reason he should be excused for not sooner discovering the approach of the other train. But, being in that situation, it became his duty, under the rule, to operate his engine at a rate of speed which would enable him to stop, if necessary, within the distance covered by his vision. That, we think, is the clear meaning of rule 93. There was on that occasion no reason why he should disregard that requirement. Peace was bound to know, at the time, that neither Harvey (the brakeman) nor the fireman was keeping a lookout ahead. As an experienced engineer, he should have known that he could not stop his train within the distance of his vision when going at the rate of speed at which he was then traveling, if a stop became necessary.

■ The negligence of the brakeman, Harvey, in failing to keep a lookout, could not justify Peace in failing to perform his own personal duty in controlling the speed of his engine. Peace evidently knew that Harvey was not in a position to see any distance in front of the engine.

■ The next inquiry is, Suppose Peace had done his duty, would the collision have been averted? The state of the testimony is such that the jury might have answered that in the affirmative. But they evidently arrived at a contrary conclusion; and we think there was testimony which, if true, supports their conclusion. According to the jury findings, those in charge of engine No. 1278 were guilty of violating rule 93, and such violation was a proximate cause of the collision. The obligation of Peace to observe that rule was no greater than that which rested upon those in charge of the other train. The conductor of the other train testified, not only that he was in a position to see engine No. 95 approaching, but that he did see it approximately a quarter of a mile before the collision occurred. While he also said that he had his train under control, the jury found to the contrary. It further appears from the evidence that he and his engineer expected Peace to reverse his course and go back to the next passing track for the purpose of permitting their train to take the siding. We have, then, a situation in which both train crews were responsible for the collision and its results. If it was the personal duty of Peace to observe the rule, it was also the personal duty of the operatives in charge of the other train to observe it. The negligence of the latter is, under the statute, misconduct for which the master is responsible. Under the facts before us, and the findings of the jury upon conflicting testimony, we cannot say that the collision was not the result of two concurring causes—the failure of the operatives in charge of both trains to obey the rule. If there is any difference in the de-

grees of negligence attributable to the guilty parties, certainly those in charge of engine No. 1278, who actually discovered the perilous situation and failed to make the necessary efforts to avert the disaster, are the more culpable.

It is also contended that Peace was negligent in failing to blow the whistle at a crossing which he passed some time before the collision occurred. There was testimony tending to show that the crossing signals were given. But, assuming that they were not, we do not think that failure could be regarded as the proximate cause of the collision, since the conductor on engine No. 1278 admitted that he actually discovered the presence of engine No. 95 some time before the trains met.

Appellant also insists that the court should have submitted the issue of assumed risk. It may be said that Peace did assume the risk of the negligence on the part of the brakeman, Harvey, in failing to keep a proper lookout ahead, because he knew that Harvey was not looking. But there was no basis for a finding that he assumed the risk resulting from the negligence of the operatives in charge of the other train. There is nothing in the evidence to indicate that he knew that such train was on the track until too late to stop. It is well settled that an injured employee does not assume the risk of the negligence of his employer, or of another servant for whose conduct the employer is responsible, unless the injured servant knows of such negligence in time to avert the injury.

We have concluded that, notwithstanding the assumption by Peace of the risk due to negligence on the part of Harvey, the administrator is not barred from a recovery.

The judgment will therefore be affirmed.