## SOUTHERN RY. CO. v. HYLTON.

Circuit Court of Appeals, Sixth Circuit.
January 28, 1930.

No. 5258.

Charles H. Smith, of Knoxville, Tenn., and J. A. Susong, of Greeneville, Tenn. (H. O'B. Cooper, of Washington, D. C., and J. A. Susong, of Greeneville, Tenn., on the brief), for appellant.

J. A. Fowler, of Knoxville, Tenn. (S. F. Fowler, and Fowler & Fowler, all of Knoxville, Tenn., on the brief), for appellee.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge. Hylton was a freight engineer running to Knoxville from the west on the Southern. Between Knoxville and Clinton a "steel gang," of which Majors was foreman, was engaged in relaying rails, working west. Hylton with his train encountered this gang between mileposts 15 and 14 west from Knoxville; the track was in an unsafe condition; the engine was derailed, and Hylton was killed. This action was brought to recover damages for his death; the court below left the issue to the jury; it found a verdict for plaintiff. The action was planted upon the Federal Employers' Liability Act (45 USCA §§ 51–59), so that contributory negligence was not a bar. The only question presented to us is whether a verdict for defendant should have been instructed.

The defendant's negligence, which is alleged and thought to be supported by proof, is that it was the custom of the defendant, for the safety of the trackmen and the coming trains, that the track gang foreman, whenever he was making the track unsafe at a point which might be hidden by curves from a train which might be approaching, should send out a flag far enough up the track to insure that any such train would stop before reaching the unsafe spot. Since it was unquestionably required, by a rule or by custom in its interpretation, that the track foreman should send such a warning flag some distance up the track to give notice to the trainmen that they were approaching the working steel gang, and since there was here unquestionable compliance with this rule and custom, the particular flag, the absence of which was counted upon as negligence, may be called the second flag. As to this second flag custom, it is the theory of plaintiff that its operation was intermittent, that, "when a rail was out," such a flag would be sent, and, "when the rail was ready," it would not be. Since the work here in progress was a continuous operation, substituting new, longer, and heavier rails for the old ones over many miles, and since the track was therefore always unsafe for passing, except as the trackmen put it in temporary order whenever they knew a train was coming, this custom is, at the best, confused and unintelligible. Whether there was such a custom, applicable to these events, and of such extent that Hylton might be presumed to have relied upon its observance, are questions as to which it may be doubtful whether the evidence in support reaches the character of substantial proof as distinguished from a scintilla. However, for the purposes of this opinion, we assume that

there was substantial proof of it, and that there was room for the jury to find that what was done by Majors in the way of sending a second flag did not satisfy the custom. These assumptions leave open only the question whether such negligence by defendant as is thus assumed in this respect substantially contributed to the derailing, or whether Hylton's own conduct was the sole efficient cause.

At Clinton, a few miles west, Hylton had stopped for orders. "Train Order 19" seems to be the general term for special warnings and cautions to trainmen. At Clinton, written upon the blank for order 19, Hylton received a copy of the train dispatcher's order, dated at Knoxville on that day, and reading: "To all trains at Clinton. Look out for steel gang laying rails today between 14 and 15 C mile posts, from 7 A. M. until 4 P. M." The uncontradicted testimony from witnesses on both sides is that this order made it Hylton's imperative duty to hold his train during this mile under such control that he could at any time stop within half the distance of his clear vision ahead. The only doubt of the existence of this duty comes from a suggestion that there were places where the ability to stop within half this clear vision would have been inconsistent with the minimum necessary speed; but there is no suggestion that there would have been any operating difficulty in always holding the train under such control that it could be stopped within the limits of the entire clear vision ahead; and, for the purpose of this case, the further limitation to half the distance may be disregarded as immaterial. The order was read by Hylton and his fireman and a brakeman then upon the engine. Hylton then went on, and, just as his engine mounted the top of Chestnut ridge, he was flagged by John Arnwine, who had been sent there for that purpose by foreman Majors. This flagman was about 2,000 feet from where the track work was then going on, and there was an intervening curve which prevented seeing one point from the other. As Hylton passed, the flagman mounted the engine, Hylton ran a few car lengths down grade, so that his long and heavy train would not be stalled on the summit, and then he stopped. This point of stopping was substantially at milepost 15, which was 1,738 feet from the later disaster. The flagman then told Hylton that the steel gang was at work relaying between this milepost and the next one, and to look out for them. Hylton passed the word to the fireman and brakeman that they were laying rails and to look out for them, and the fireman repeated the notice back. Hylton stood

there a few minutes pumping up the air, and then started on down with his brakes partially applied and his train under full control.

Between him and the steel gang there was first a slight and immaterial curve to the right and then a seven degree curve to the left,[1] and on the left a rising hillside which had been terraced out for the track grade; but this rising bank was cut back and sloped for some distance from the track. The result of the curve and grading was that the track gang at work came into view from the fireman's side of the engine at a distance variously stated at from 600 to 1,000 feet. The brakeman on watch at once saw the gang, and called to Hylton, and Hylton used every effort to stop; but his speed (estimated at 12 miles) was such that he could not. Such excuse, or rather explanation, as there is for his failure to obey the 19 order, is stated by the fireman, who says that, after starting at milepost 15 and going a short distance, Hylton noticed some men on the track down well towards milepost 14, and indicated that he thought they were the steel gang, so that just here he could run a little faster, and he then released the brakes. Then he either misjudged his momentum and speed, and quickly lost control, or had used up too much air on his first brake application, and neglected to replenish it, or both. In any event, he plainly disobeyed the 19 order, and substituted his own judgment. He not only did not keep his train under control, within the distance directed, but, after once coming to a dead stop, and after again having maintained for a period perfect control, he deliberately released it. If he had obeyed the 19 order, there would have been no derailment.

It is difficult to accept just the theory of facts which we have recited. The distance from the point of stopping at milepost 15 to the point where the engine men saw the track gang is only about 1,000 feet (at the most), and how Hylton could have pumped his air up and fully maintained effective braking for any substantial distance, and then, in the remainder of the 1,000 feet, and "just a few seconds of time," picked up speed enough so that his remaining air would not hold the train, is difficult to understand; but we give plaintiff the full benefit of this theory. Further, as to the second flag, it should be stated

---

[1] The obstruction of vision caused by a seven-degree curve may be understood by observing that such a constant curve would produce a circle slightly more than one mile in circumference, or one-fourth mile to make a right angle. The grade was 1.75, or about 90 feet to the mile, said to be a moderate grade for a hill country.

that, when Majors heard the train coming up the grade on the other side, and in order to guard against the possibility that the 19 order might have missed connection or been forgotten, and that Flagman Arnwine's signal might be omitted or disregarded, he sent a man up the track to give further warning, but before this man got around the curve Majors heard the train stop at the summit. He then knew that the flag warning had been given, and so he called back the extra man; but in a few minutes, hearing the train running again, and "working too fast" Majors sent the man up again. This man came in view of the train, and gave it the "wash out" signal just when the enginemen saw the trackmen—about 700 feet from the derailment. It is apparent that, if the second flag had been sent out and stationed at this distance of 700 feet—a distance ordinarily sufficient to enable a train under fair control to stop—it could have made no difference in the result, because at that point Hylton had full knowledge of the danger. See Copeland v. Hines (C. C. A. 6) 269 F. 363.

In this situation we think it clear that Hylton's general disobedience of the 19 order and his specific and voluntary release of control because he had misjudged the distance of the danger constituted the sole efficient cause of the disaster, and the absence of any further second flag cannot be treated as a substantially contributing cause. The recent decisions of the Supreme Court require this conclusion.

The controlling principle, though arising under different facts, is stated in Great Northern Railway Co. v. Wiles, 240 U. S. 444, 448, 36 S. Ct. 406, 408, 60 L. Ed. 732. A freight train broke in two, due, as the court assumes, to the company's negligence. Wiles was the rear brakeman. It was his duty to go back and flag the following train. He did not do so, and he was killed in the ensuing rear-end collision. His representatives brought the suit. In reversing the judgment for plaintiff, the Supreme Court said: "There is no justification for a comparison of negligences or the apportioning of their effect. * * * In the present case there was nothing to extenuate Wiles' negligence; there was nothing to confuse his judgment or cause hesitation. His duty was as clear as its performance was easy."

In Frese v. Chicago, etc., R. Co., 263 U. S. 1, 44 S. Ct. 1, 2, 68 L. Ed. 131, there was a collision at a grade crossing of two railroads. One of the engineers was killed, and this action against his employer resulted. His contributory negligence was not involved. It was his duty under the rules (and it was no different duty because it was also required by statute) to bring his train to a full stop and ascertain that the way was clear before proceeding. He brought his train to a stop, and proceeded, and was in collision. The other train was approaching from the fireman's side, and it was plainly the fireman's duty to keep watch for such approach and give notice to the engineer. The fireman had neglected this duty. Without that neglect, the collision would not have occurred. The court denied any recovery on behalf of the engineer, and said: "Moreover the statute makes it the personal duty of the engineer positively to ascertain that the train can safely resume its course. Whatever may have been the practice he could not escape this duty, and it would be a perversion of the Employers' Liability Act [45 USCA § 53] to hold that he could recover for an injury primarily due to his failure to act as required, on the ground that possibly the injury might have been prevented if his subordinate had done more." The only suggested distinctions between that case and this are as between a statute and a train dispatcher's express order, and as between a subordinate and an employee in another department. We see no substance in these distinctions.

In Davis v. Kennedy, 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212, Kennedy's representatives brought an action under the Federal Employers' Liability Act. Kennedy had been the engineer of train No. 4, going west from Nashville. He collided with train No. 1 coming east to Nashville. There were double tracks at Nashville uniting into one a little further west. Under train schedules, No. 1 had the right of way, and the crew of No. 4, including Kennedy, had standing positive orders not to pass on to the single track unless they knew that No. 1 had finished its use and entered on the double track. Kennedy thought he saw No. 1 on the double track; so did the other members of his crew; but they were all mistaken. In the court below (S. C. Tenn.) it was held that the other members of the crew, as well as Kennedy, were as much bound to look out for No. 1 as he was, and that therefore through them the railroad was negligent, and so under this act became liable to Kennedy. It seems clear enough that there was negligence in this respect by the other employees, and that, if they had done their duty, the collision would not have occurred. At least the Supreme Court so assumes; but the judgment was reversed, the court saying: "It was the per-

sonal duty of the engineer positively to ascertain whether the other train had passed. His duty was primary, as he had physical control of No. 4, and was managing its course. It seems to us a perversion of the statute to allow his representative to recover for an injury directly due to his failure to act as required on the ground that possibly it might have been prevented if those in secondary relation to the movement had done more." This language needs no adaptation to apply it to the instant case.

In Unadilla Valley R. Co. v. Caldine, 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224, a collision had taken place near Bridgewater, and Caldine, the conductor of train No. 2, had been killed. Caldine had the definite order that his train was to pass No. 15 in the Bridgewater yard, and that No. 15 was to take a siding there and allow No. 2 to pass. On this occasion, for some unknown reason, Caldine directed his train to go on beyond Bridgewater, and a collision occurred. The court below (246 N. Y. 365, 159 N. E. 172) had found the necessary negligence of the railroad through employees other than Caldine, because there had grown up a custom by which the conductor of No. 15, if he was a little late, would telephone that fact from his last station before Bridgewater, and the agent at Bridgewater would take this message and deliver it to Caldine, thus giving to him a further warning that he must obey the rule. On this occasion the telephone message was sent. The agent said he told the motorman of No. 2; the motorman denied this; but at any rate, through somebody's negligence, the customary special notice and warning did not reach Caldine. The Supreme Court held that there was no cause of action, saying: "The phrase of the statute, 'resulting in whole or in part,' admits of some latitude of interpretation and is likely to be given somewhat different meanings by different readers. Certainly the relation between the parties is to be taken into account. It seems to us that Caldine or one who stands in his shoes is not entitled as against the Railroad Company that employed him to say that the collision was due to any one but himself. He was in command. * * * He cannot hold the Company liable for a disaster that followed disobedience of a rule intended to prevent it, when the disobedience was * * * brought about by his own acts. * * * A failure to stop a man from doing what he knows that he ought not to do, hardly can be called a cause of his act. Caldine had a plain duty and he knew it. The message would only have given him another motive for obey-

ing the rule that he was bound to obey." In comparing the facts of the Caldine Case with those of the present case, we find no substantial distinction. The second flag would only have given Hylton another motive for obeying the rule that he was bound to obey. See Norfolk, etc., Co. v. Gesswine (C. C. A. 6) 144 F. 58; Virginian R. Co. v. Linkous (C. C. A. 4) 230 F. 88; Copeland v. Hines, supra; Blunt v. Pa. R. Co. (C. C. A. 6) 9 F. (2d) 395; Unadilla Valley R. Co. v. Dibble (C. C. A. 2) 31 F.(2d) 239.

The suggested distinction, as to the Frese and Davis Cases, that the concurring negligence which is disregarded in those cases was that of an associate or subordinate while Majors and Hylton were in separate departments, cannot survive the Unadilla Case, for there the assumed—but immaterial—further negligence was that of the station agent.

Our attention is called to our decision in Pennsylvania Co. v. Cole (C. C. A.) 214 F. 948. In so far as this may be inconsistent with the three cited recent Supreme Court cases, it must be considered as overruled by them.

For the reasons stated, there must be a new trial, and to that end the judgment is reversed.