### COOLEY v. NEW YORK CENT. R. CO.
### No. 169.

Circuit Court of Appeals, Second Circuit.

Jan. 6, 1936.

Whalen, McNamee, Creble & Nichols, of Albany, N. Y., for appellant.

Arthur B. Lanphier, of Albany, N. Y., for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff's intestate, Hormidas Provost, died on the night of December 15, 1933, from accidental injuries received while performing his work as a brakeman employed by the Boston & Albany division of the defendant in its freight yard at Springfield, Mass. The suit is for the benefit of the widow and next of kin under the Federal Employers' Liability Act (45 U.S.C.A. § 51). Refusal to grant the defendant's motion for a directed verdict and submission of the issues to the jury in the form of special interrogatories instead of taking a general verdict are principally relied upon for reversal.

Shortly previous to the accident, the deceased had been working with his switching crew, consisting of Sullivan, the conductor, O'Neil, another brakeman, himself, and an engineer and fireman, placing on sidings in the Summer street section of the Springfield yard freight cars they had brought in from West Springfield. Sullivan, then telling Provost to place the last two of them, refrigerator box cars, on what was called the Atlantic States warehouse siding in another part of the yard known as the Liberty street yard, went to still another section to throw switches for the

movement to be undertaken after the refrigerator cars were placed at the warehouse. Pursuant to Sullivan's instructions, Provost and the rest of the crew proceeded to take the two cars across the yard. In doing this O'Neil rode on top of the leading car and Provost at the side of one of them to a switch which Provost then threw to open the way to a cross-over track. After that the necessary switches were thrown by the tower man to let the movement across the yard to a track known as No. 5 from which a switch led into the warehouse siding. Provost walked across to this switch while the cars were being taken there. He got to the No. 5 track switch about the time the cars arrived; signalled the engineer to stop; threw the switch; stepped into the stirrup below the ladder on one of the cars; and signalled the engineer to proceed into the siding. This is all that is known about him until after the accident.

O'Neil was riding on top of the leading car as they left the switch Provost had just thrown. He was where he could see the siding onto which they were going and where he could be seen by the engineer, whose sight to the siding was obstructed by the cars, and who of necessity depended upon O'Neil to give him the controlling signals.

On the siding at a distance of 123½ feet from the No. 5 track switch which Provost had thrown was a derail switch, whose only purpose was to provide a safety factor if an emergency were created by an accidental movement of cars after they had been placed on the siding, should their brakes fail to hold them from moving toward track No. 5. If they did start, they would be thrown off the siding track by the derail before getting near enough track No. 5 to endanger traffic there. No cars could pass the derail in either direction and stay on the track when it was set against them. This derail switch was equipped with a signal light that showed purple toward track No. 5 when the derail was on and green when it was off. Although Provost had passed near this switch in going to the one he did throw, he had not stopped to open it.

With conditions as described, the engineer started the cars into the siding in response to Provost's signal, and O'Neil from the top of the leading car kept signalling to the engineer to keep them moving, until suddenly he raised his lantern in a signal to stop just at the time the engineer felt a slight jar. That was when the leading trucks of the car going in ahead struck the derail. The stop was not completed before that car went off the tracks with force enough to carry one end over against the platform of the warehouse. Provost was found critically injured on the ground between the car and the warehouse. He was conscious while being taken to a hospital, but there soon died. Before the trial O'Neil had also died, though from causes unconnected with the accident. A few minutes after the accident, it was noticed that the derail switch was open, with its lights in good order, but there was nothing to show how it was opened. Both sides agree that the car was derailed by the switch.

When the cars were moving toward the derail switch, its purple light was visible to O'Neil while he was signalling the engineer to proceed. This was, or should have been, ample evidence to him of the dangerous condition of the siding relative to the movement he was directing, and justified the jury in finding O'Neil guilty of negligence attributable to the defendant in directing the movement against a closed switch clearly visible, unless it can be said as a matter of law, and as the defendant claims, that it was Provost's duty to open the switch in time to prevent the accident, and that he, failing in that respect, was guilty of negligence which was the sole proximate cause of his death. If so, there can be no recovery. Illinois Cent. R. Co. v. Skaggs, 240 U.S. 66, 36 S.Ct. 249, 60 L.Ed. 528.

There was considerable evidence to the effect that, when two or more brakemen were at work in a switching crew, the one nearest a switch to be thrown would usually throw it. There was testimony also that the conductor often threw switches. While it was not conclusively shown, we will assume that both Provost and O'Neil knew that it was Provost's job to throw this derail switch before the cars were switched into the siding. Even so, O'Neil's negligence attributable to the defendant could have been found by the jury to have been the sole proximate cause of the accident. As it is undisputed that, when a brakeman had to throw two switches, he could choose which to throw first, the only fault attributable to Provost is his failure to throw the derail switch before he threw the track No. 5

818

switch and signalled the engineer to start. That was the customary procedure, but, during all the time it took for the cars to move the distance from the first switch where Provost gave his last signal back to the derail switch, O'Neil was warned by the purple light that the switch was not opened, and could have stopped the movement at will to give Provost a chance to open the derail. Had he heeded the purple signal on the switch, as he should have done while directing the movement, the accident would not have occurred, even though Provost had opened the wrong switch first and had given the initial signal onto the siding prematurely. It is at most a situation of the fault being wholly attributable as a matter of law to the last man who failed in his duty because he had ample opportunity to prevent the accident after he knew of the failure of the first and prudent conduct required him to prevent it. Great Northern R. Co. v. Wiles, 240 U.S. 444, 36 S.Ct. 406, 60 L.Ed. 732; McCalmont v. Pennsylvania R. Co. (C.C. A.) 283 F. 736. So the motion for a directed verdict was properly denied.

■ Instead of taking a general verdict, the court over the objection of both parties, prepared and submitted seven questions to the jury, and entered judgment on the special verdict after defendant had moved to set it aside as excessive and the plaintiff had filed a remittitur as to part of the damages found. Defendant now insists that, as none of these questions required the jury to report their finding as to assumption of the risk by Provost, that question was improperly withdrawn, although it had been covered in the charge.

When the questions had been submitted and the jury had retired, counsel for both parties were given the opportunity to put their objections on the record. In connection with his objections, the plaintiff's attorney suggested a withdrawal of the questions. The judge then said: "Well, under the circumstances, both sides objecting to them and asking for a general verdict the Court is inclined to accede to the request, if both sides are satisfied to have it so. The marshal will bring in the jury?" Thereupon defendant's attorney objected to the withdrawal. Up to this time it is obvious that the defendant could not have been prejudiced by the mere submission of questions which had not been answered. Assuming, without deciding, that it could have been prejudiced by the way

in which the case was submitted, it is clear that ample opportunity was afforded by the offer of the court to take a general, instead of a special, verdict to enable it to have eliminated from the trial then and there any possibility of harm. It was given its choice of a general verdict or a special verdict based upon the questions submitted, and declined to make any election. Having thus permitted the special verdict to be taken when it could have had done instead exactly what it now claims should have been done, it waived the exception taken to the submission and will not now be heard to complain.

As the charge covered the law applicable to every issue adequately, we find no ground for reversal.

Judgment affirmed.