MISSOURI PACIFIC RAILWAY COMPANY, THOMPSON, TRUSTEE, *v.* GUY.

4-6495                                        157 S. W. 2d 11

Opinion delivered November 24, 1941.

*Henry Donham* and *Pat Mehaffy,* for appellant.
*J. H. Lookadoo,* for appellee.

GREENHAW, J. This is an appeal from a judgment of the Clark circuit court awarding the appellee, a young man twenty-four years of age, $25,000 for personal injuries which he claimed to have received while an employee of the appellant upon a weed burning machine. The appellee was employed in the summer of 1939 and worked on a weed burning machine. In December, 1939, he took an examination upon the rules promulgated by the appellant for the safety of its employees and others. He stood a good examination, and passed with credit to himself, having answered correctly 243 rules upon which he was examined.

This suit was filed on September 28, 1940, under the Federal Employers' Liability Act. Appellee claimed that his injuries were the result of negligence on the part of the appellant's servant, agent and employee in shifting gears on the weed burner in such a manner as to cause it to give a sudden, violent, unusual and unnecessary jerk, thereby throwing the appellee off the machine, resulting in serious and permanent injury to him.

On August 31, 1940, the date of his alleged injuries, he was working on a comparatively new Giant Octopus weed burning machine, the machine having been used only about six months prior to his alleged injuries. The weed burning machine is in two sections, the first section being a large tank which carries the fuel for operation of the motor and burners, and the other section, which is attached to the fuel section and follows immediately behind it, is the section where the appellee was working. Three employees operate the weed burning machine. The conductor sits on the front part of the fuel section in order to keep a lookout in the direction the weed burning machine is moving, and the other two employees sit op-

posite each other on the rear section facing the rear, and operate the weed burners. The weed burners extend out from the rear of the second section and are adjustable, so that the operator of each burner can move it around from place to place, burning the weeds, while the machine is moving along the track.

On this occasion, H. B. Jones was in charge of the weed burning machine, operating the weed burner on the right side of the machine, and the appellee was operating the weed burner on the left side of the machine.

The evidence showed that the machine needed oiling once a day, and Mr. Jones oiled it that morning before they started to work and before appellee arrived. They had been burning weeds from around 7 a. m. until around 11 a. m., at which time they placed the machine on a switch, where it remained stationary for some 15 or 20 minutes while a freight train and a passenger train passed on the main line. After the trains had passed, the weed burning machine was moved back on the main line, and had gone a distance the equivalent of one or two city blocks when the alleged injuries took place. After the weed burner had been placed in motion and was moving slowly along a level track, the appellee left his seat, which was at a rather high position on the rear section of the machine, and went down upon a low platform on his side and oiled some machinery. The platform he was standing on, according to the evidence, was about 18 inches from the ground and about 10 inches wide. The length of the platform did not appear in evidence, but from the pictures of the machine which were introduced it extended for some feet along the side of the machine. There was a long bar placed alongside the machine at a convenient place for an employee to hold to.

The appellee testified that after he had finished oiling the machinery on his side there was a sudden jerk of the machine, due to changing gears, which threw him off the machine, causing him to be struck by part of the machine and knocking him some 10 or 15 feet down a dump; that at the time this occurred the machine was traveling at a rate of 10 or 12 miles per hour. The other evidence showed that the machine was moving along at

a very slow rate, which is usual and customary when the weed burners are being operated, and all parties connected with the operation of the machine testified that at the time this occurred the weed burners were lighted and in use. The evidence further showed that the machine is operated in low gear when the burners are in use.

It was undisputed that the appellee left his seat where he was supposed to work of his own volition and went down on the side of the machine to oil it without being instructed to do so by Mr. Jones who was in charge of the machine. The appellee admitted that he was familiar with the rules of the company. Rules 146, 148 and 173 promulgated by the appellant, and which were in effect at the time, were introduced in evidence and are as follows:

Rule 146: "No repairs or adjustments must be made to any part of the car or machine while the car is in motion, except in necessary regulation of fuel and spark. When repairs are made, cars must be removed from main track or protected by flag."

Rule 148: "Scuffling or changing position while car is in motion must not be permitted."

Rule 173: "Repairs to motor cars, weed burners and discers must not be made while the machinery is in motion. When repairs are made, car must be moved from main line or protected by flag."

The appellee was immediately taken to the office of Dr. McLean in Gurdon who testified that the only visible evidence of injury to the appellee was "a bruise or an abrasion" about one-half inch long on his left shoulder, which did not penetrate the skin; that he made a thorough examination of the appellee, stripped him and looked him all over, and that was all he was able to find wrong with him; that the appellee told him that he slipped and fell off the machine, and that he sent him to the hospital, as he had no X-ray machine to take pictures.

H. B. Jones, who was in charge of the machine, testified that he had been a weed burner operator since May, 1927, being the oldest operator of this type of machine employed by appellant; that at the time of the alleged

injuries to appellee the machine was moving at about four or five miles an hour, and that appellee's duty required him to operate the control wheel on the left side facing the rear, while witness operated the wheel on the opposite side, and that the track at that point was level; that he oiled the machine that morning at Prescott before they started operating, and that the rules required that it be oiled while standing still; that he instructed the appellee when he began working for him and told him not to oil the machine or move about on it while it was in motion; that before the alleged injuries they had been stopped for a few minutes, and when the appellee took his seat they started off, and shortly thereafter the appellee went down upon the running board, and while he was standing there with his hand on the rail, he stepped off on the ground and rolled down a dump 12 or 15 feet; that the machine did not make any jerk or lunging movement of any kind nor strike appellee; that there was no occasion to shift gears, and he did not do so; that the machine does not give a jerk even when gears are shifted; that he "hollered" at the appellee when he started down, but he probably did not hear him on account of the noise; that he reached over and rolled the burner which the appellee was supposed to operate over to keep the blaze from hitting him, and that he then applied the brakes and stopped the machine in eight or ten feet.

The conductor of the machine, O. J. Clark, testified that the machine was moving along very slowly, at from four to six miles per hour, at the time of the alleged injuries, on a level track, and that the machine was in low gear in a steady pull; the burners were lighted, no gears were shifted, and there was no unusual lunge or jerk.

J. W. Mashburn testified that he was in the hospital when appellee came there and for a while they were in the same room; that appellee told him he was oiling a chain on the weed burner and the oil can got caught in the chain, and he fell over backward and an iron pipe hit him in the back; that getting the oil can spout caught in the chain was what caused him to lose his balance and fall; that witness was also a weed burner helper, did

the same work as appellee, and he never oiled a weed burner when it was running; that Jones told him not to oil it when it was running, but to oil it when it was stopped. That he also worked for another operator who told him the same thing.

Witnesses J. R. Randall, D. Mitchell and W. C. Harris testified that within a very short time after the alleged injuries had taken place the appellee stated that no one was to blame for it, and Randall and Harris further testified that appellee said that he just made a misstep and stepped off backward.

There was evidence to the effect that this machine was so large and heavy that it could not be jerked sufficiently in changing gears to throw a man off.

The appellee was brought to the Missouri Pacific Hospital, where he was carefully examined by four doctors. Dr. George Lewis, district surgeon for the Missouri Pacific, testified that the appellee was brought to the hospital on August 31 and was discharged therefrom on September 21; that he examined the appellee shortly after he entered the hospital; examined him thoroughly, and the only evidence of injury he could locate was a small scratch about one-half inch long on his left shoulder, which did not go through the skin.

Dr. Pat Murphy, a nerve specialist, was called and made an examination of the appellee. He testified that every test known to medical science for appellee's alleged ailments was given him, and that a scratch on his left shoulder was all that he was able to discover.

Dr. Vernon Newman, who specializes in bone and joint surgery, was called and made a thorough examination of the appellee, and was unable to find anything wrong with him.

Dr. D. A. Rhinehart, an X-ray specialist, made several X-ray pictures, probably 20, in which he X-rayed the appellee at every place where he seemed to be suffering pain. In fact, he X-rayed practically his entire body from the head down, and he testified that all of these X-ray pictures were negative, and that there was nothing to indicate any injury to the appellee.

The appellee testified that he had suffered severe pain, a partial paralysis of parts of his body, his nerves and nervous system were injured, he was bothered with his internal organs, and that his bowels and bladder were causing him trouble. After the appellee left the hospital, he consulted Dr. A. G. McGill, who testified that he treated appellee for some time; that his back, spine, and brachial plexus nerves were injured. He described other injuries and said that part of appellee's injuries were permanent.

A motion for new trial assigning numerous errors, among which was the failure of the court to direct a verdict for appellant, was filed and overruled.

We have concluded that under the evidence in this case there was no negligence on the part of the appellant, its agents or employees, and that the appellee's injuries were the result of the risk which he voluntarily assumed. It is admitted that he was not instructed by anyone to leave his usual place of work while the machine was in motion and go down upon the running board and attempt to oil any part of the machinery. The evidence showed that the machinery had already been oiled that day, and that one oiling each day is all that was required. His actions in doing this were not only contrary to the rules of the company, but contrary to the instructions which foreman Jones testified he had theretofore given him.

We quote from 39 C. J., § 968, p. 768, as follows: "Where a servant voluntarily and unnecessarily places himself in an obviously dangerous position in performing his work, he assumes the risk incident to the dangerous position in which he places himself and cannot recover for injuries sustained thereby, even though the same services have been performed at other times by other employees in the same place, and especially where the servant acts in disobedience of orders."

Section 966, p. 766 of the same authority provides: "Except perhaps in a few jurisdictions, the general rule is that, where there are two ways in which work may be done, one safe or reasonably safe and the other hazardous, and the servant knowingly adopts the hazardous method of doing the work, he is held to have assumed the risk of so doing and cannot recover for any injuries

sustained thereby, and the general rule has been held applicable, although other employees of the master also adopt the dangerous method of doing the work."

Section 922, p. 716 of the same authority provides: "The rule that a servant assumes the ordinary risks and hazards incident to the work for which he is employed applies with full force and effect to servants of a railroad company in all branches of the service; and the operation of this rule is in no way affected by the provisions of the Federal Employers' Liability Act."

Even if the gears were shifted, that is a necessary part of the operation of the machine, and it is a usual and ordinary risk which anybody working thereon would assume. A necessary and ordinary operation of shifting gears on the machine would not, of itself, be negligence. In the case of *Missouri Pacific Railroad Co.* v. *Baum,* 196 Ark. 237, 117 S. W. 2d 31, this court said: "The law is that negligence is never presumed, but, like fraud, must be proven. Except in cases where the doctrine of *res ipsa loquitur* applies, negligence is not even presumed from proof of the happening of an accident and resulting injury. . . . In other words, a jerk or jar which is necessarily incident to the mode of the conveyance and the practical operation of the train is not the result of negligence, and, even though injury results therefrom, the carrier cannot be held liable."

In the case of *St. Louis-San Francisco Railway Company* v. *Porter,* 199 Ark. 133, 134 S. W. 2d 546, this court held: "The gist of the negligence alleged is that the train started with a sudden lurch or jerk. But if it be conceded, contrary to all the evidence except that of appellee herself, that the train was started with a jerk or a lurch, that fact would not justify a recovery, unless there was a negligent jerking or lurching of the train. It was so held in *Harris* v. *Bush, Receiver,* 129 Ark. 369, 196 S. W. 471, where it was said: 'There is much evidence tending to show that there was no unusual jerking or lurching of the train either at Argenta or while slowing down to a stop at the Little Rock station. Unless it was a negligent jerking or lurching of the train, it is apparent that appellant had no cause of action against

appellee. In other words, if the injury was purely acci-
dental and not the result of the negligent operation of the
train, appellee would not be responsible.' Again in the
same case it was said, 'There is no escape from the
conclusion that unless appellant was injured through the
negligent jerking or lurching of the train, then her injury
must have resulted from some carelessness on her own
part.' . . . She assumed all the ordinary risks and
hazards necessarily incident to the usual and ordinary
manner of starting the train, and the expletives or epi-
thets used by her in describing the manner of the start,
did not change the manner of the start.''

If the doctrine with reference to lurching and jerk-
ing of trains is applicable to a passenger, as announced
by this court in the above decisions, it would certainly
apply more forcibly to an employee, such as the appellee,
whose duty it was to work upon and be familiar with the
usual and necessary operations of the weed burning
machine.

Appellee contends that Rules 146 and 148 do not
apply to a weed burning machine, but are applicable to
other kinds of cars, and that the rules do not provide
that one must not move around and oil the machinery
while the motor car is moving. We cannot agree with
this contention. We think that under the evidence in this
case the contrary would be the ordinary and reasonable
interpretation. After all, the purpose was to prevent
accidents while motor propelled cars were in movement,
regardless of the kind of motor propelled vehicle it might
be. Not only had appellee passed a creditable examina-
tion upon the rules, but he admitted that he was familiar
with Rule 1, which required him to be familiar with all
rules which had been promulgated for the safety of him-
self and others. He was an intelligent and capable young
man, earning more than $100 per month, interested in
knowing the rules, and no doubt eager for promotion.

In connection with the liability of a railroad company
to its employee under the Federal Employers' Liability
Act, we quote the following from *Paster* v. *Pennsylvania
Railroad Company,* 43 F. 2d 908: ''Even after the Fed-
eral Employers' Liability Act, when the distinction be-

tween contributory negligence and assumption of risk first became important, it was supposed that the violation of a rule was only contributory negligence. *New York, etc., R. Co.* v. *Niebel,* 214 F. 952. . . . In a series of late cases, however, under the Federal Employers' Liability Act, the Supreme Court has modified this rule, as we understand it (*Frese* v. *C., B. & Q. Ry. Co.,* 263 U. S. 1, 44 S. Ct. 1, 68 L. Ed. 131; *Davis* v. *Kennedy,* 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212; *Unadilla, etc., Ry. Co.* v. *Caldine,* 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224); and the lower courts have followed (*Southern Ry. Co.* v. *Hylton,* 37 F. 2d 843; *Unadilla, etc., Ry.* v. *Dibble,* 31 F. 2d 239). In these it was held that the disregard by a servant of specific orders or standing rules, promulgated for his own safety, will bar his recovery though the injury was due as well to the fault of other servants." To the same effect is the case of *Van Derveer* v. *Delaware L. & W. Ry. Co.,* 84 F. 2d 979.

With reference to the violation of a rule of a railroad company by an employee, the Supreme Court of the United States, in the case of *Unadilla Valley R. Co.* v. *Caldine,* 278 U. S. 139, 49 S. Ct. 91, 73 L. Ed. 224, said: "He cannot hold the company liable for a disaster that followed disobedience of a rule intended to prevent it, when the disobedience was brought about and intended to be brought about by his own acts."

In addition to the authorities above quoted, this court in the case of *St. Louis, Iron Mountain & Southern Ry.* v. *Steel,* 129 Ark. 520, 197 S. W. 288, on pp. 530-532, said: "A contract between the master and servant involves certain reciprocal duties which, if not expressed, are clearly implied, and grow out of the relation between them. Among others on the part of the master is the duty to exercise ordinary care to furnish his servant with a safe place to work, and to this end the master may adopt reasonable rules and regulations for the protection of the employees while in the performance of their duties. And it is the duty of the servant to exercise ordinary care for his own protection, and in so doing to obey the rules which the master has adopted and promulgated to insure the safety of the employee.

"It is undoubtedly the doctrine of our own court that the violation by the servant of an unambiguous rule of the company for his protection, and of which he had knowledge, acting independently and not under the direction of his foreman or superior in work, is negligence *per se* and may be so declared as a matter of law. *Snellen v. K. C. So. Ry. Co.*, 82 Ark. 334, 102 S. W. 193; *Young v. St. L., I. M. & S. R. Co.*, 100 Ark. 380, 140 S. W. 584."

We think whatever injuries appellee sustained were brought about solely by his own negligent action, in contravention of the rules of appellant; that he clearly assumed the risk and that the appellant is not liable under the evidence in this case for the injuries he sustained. Having reached the conclusion that any injuries which the appellee received in this case were clearly the result of a risk which he voluntarily assumed, and for which the appellant is not liable, and since the cause seems to have been fully developed, the judgment is reversed and the cause dismissed.

Mr. Justice HUMPHREYS thinks questions for the jury were made, and therefore dissents.